In the Supreme Court of Georgia


Decided:   July 5, 2016


S16A0398.   SMITH v. THE STATE.


NAHMIAS, Justice.

Appellant Deonte T'varis Smith challenges his conviction for felony murder in connection with the death of his two-month-old daughter, Keymaya Smith.  Appellant contends that the trial court committed reversible error by allowing the State to cross-examine him about tattoos on his arm and by allowing the State's expert witness to give a demonstration using a baby doll. As explained below, the trial court abused its discretion in allowing the full line of questioning about the tattoos, but any error was harmless, and the court did not abuse its discretion in permitting the expert's demonstration.  We therefore affirm.[1]

---

[1]  The baby died on April 13, 2012.  On July 31, 2012, a Decatur County grand jury indicted Appellant on three counts of felony murder, two counts of first degree child cruelty, and one count each of aggravated assault and aggravated battery.  At a trial from February 10 to 12, 2014, the jury found Appellant guilty of all charges.  The trial court sentenced Appellant to serve life in prison for felony murder based on child cruelty, and the other counts merged or were vacated by operation of law.  On March 10, 2014, Appellant filed a motion for new trial, which he amended with new counsel on June 12, 2015.  The trial court held an evidentiary hearing on June 24, 2015, and entered

1.     Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. On the evening of April 12, 2012, Appellant was at his trailer home with the baby victim and her mother, Shamiah Rainey. Appellant's sister and Rainey's one-year-old son were also there. The baby was fussy, and Rainey and Appellant attempted to calm her on several occasions throughout the night. The last time the baby woke up crying, Appellant went into her room alone; after he was there for several minutes, the baby began exhibiting signs of distress. Appellant's sister was in her room the whole time, and Rainey was in the living room with the one-year-old. At some point, Rainey noticed that she had a missed call from Appellant on her cell phone, so she went into the baby's room. As soon as she saw the baby, Rainey told Appellant that they needed to take her to the emergency room.

Rainey and Appellant then drove the baby to Bainbridge Hospital. When they reached the hospital, the baby was not breathing and was in cardiac arrest. The medical staff was able to resuscitate her, but she required life support equipment. A nurse noticed abnormal bruises that were just starting to form on

an order denying the motion on August 10, 2015. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the January 2016 term and submitted for decision on the briefs.

2

the baby's cheek and abdomen. The on-call pediatrician, Dr. Michael Carpenter, decided that the baby needed to be in a neonatal intensive care unit and ordered her to be transported to nearby Tallahassee Memorial Hospital. Appellant told Dr. Carpenter that the baby had been fussy and had not had a bowel movement that day. He also told Dr. Carpenter that he tried to facilitate a bowel movement by "squeezing" her around the abdomen and demonstrated with his hands. Dr. Carpenter later testified that he found Appellant's explanation and demonstration atypical of the way that anyone would assist a baby having difficulty with a bowel movement. Rainey testified that the baby had had a bowel movement that day, and the medical examiner testified that the baby was not constipated and had no stool in her bowels.

At the hospital in Tallahassee, the baby was treated by Dr. Todd Patterson, a very experienced neonatologist and intensive care pediatrician. A CT scan of the baby's head showed multiple areas of hemorrhage and areas with signs of brain death. The baby had retinal hemorrhaging and "tremendous injury" to her head that could not have been caused by a fall from a chair or from being dropped. Keymaya was pronounced dead at 10:55 p.m. the following day. Dr. Patterson later testified that Appellant's description to him of what happened to

the baby – that Appellant held her up so that she could have a bowel movement and fed her, and she then vomited and stopped breathing – did not explain the child's severe injuries.

The medical examiner, Dr. Anthony Clark, determined that the cause of death was abusive closed head and neck trauma. An autopsy revealed injuries over the baby's entire body, including multiple bruises on her face, chest, and head; hemorrhages on her head and in her brain, leg, and spinal cord; fractures of her ribs, leg, and arm, caused at various times; swelling and detachment of her brain inside the skull; and internal severance of her neck. Dr. Clark testified that the baby's rib fractures and severe brain injuries resulted from her being squeezed around the chest, from her being grabbed and violently shaken, and from her head being slammed; the doctor said that her injuries could not have been caused by being dropped or falling off a bed as the defense had suggested.[2]

_____

[2] In detail, the baby had deep bruising on her left chest area that appeared to be caused by a thumb-type compression, a linear bruise in the left side of her abdomen that likely resulted from a pinching-type injury, retinal hemorrhaging and hemorrhaging around the optic nerve, deep bruises on her forehead, and numerous hemorrhages inside the skull caused by multiple impacts to the back of the baby's head, and the baby's soft spot had been forced open more than it should have been. According to Dr. Clark, the baby's brain had been jostled inside the skull so violently that her blood vessels were torn, and she had massive hemorrhaging around the brain and shifting brain tissue. The baby also had a neck injury, which resulted from the process of grabbing the baby, shaking her, and slamming her head; as a result, the baby suffered a tear of the disc between the bony vertebral bodies and hemorrhaging along and outside the spinal cord, and her neck was severed. Additionally, the baby had multiple rib fractures in different stages of healing, some of which were re-injured and re-

4

Dr. Clark further testified that the baby would have shown symptoms, such as seizures, drooling, difficulty breathing, and glazed eyes, within seconds to minutes of being struck and shaken in the manner that inflicted her head and neck injuries. Dr. Clark used a baby doll during his testimony to demonstrate where the baby's injuries were, how the squeezing injuries were most likely inflicted, and the amount of force necessary to cause the injuries that he found in the baby's head and neck.

Appellant testified at trial. He claimed that before Rainey entered the room, he prepared the baby's bottle while holding her, attempted to feed her, and tried unsuccessfully to relieve her of her constipation by rubbing her stomach and then holding her up and squeezing her. Appellant said that he changed her diaper anyway and attempted to feed her again, at which point she began vomiting, and he cleaned it up. Appellant asserted that the door to the baby's room was open and that Rainey would have noticed if he were hurting the baby, but he also testified contradictorily that he yelled for Rainey when the

fractured causing bleeding in the tissues, which were caused by someone putting his hands around the baby's chest and viciously squeezing. Finally, the baby had hemorrhaging along the left femur caused by gripping the leg and swinging the baby, and her forearm had a fracture that had already healed and was caused by shaking or violently snatching her.

baby's symptoms appeared yet she could not hear him.

Appellant does not dispute the legal sufficiency of the evidence supporting his conviction. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of felony murder. See Jackson v. Virginia, 443 U.S. 307, 319 (99 SCt. 2781, 61 LE2d 560) (1979). See also Vega v. State, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

2. Appellant contends that the trial court abused its discretion in overruling his relevancy objection to the prosecutor's line of questioning about his tattoos. We conclude that any such error was harmless.

(a) In an effort to dispute that he had the right-hand strength needed to inflict the injuries the victim suffered in the way the medical examiner said these injuries had occurred, Appellant testified on direct examination that he is naturally right-handed but that his dominant hand is now his left hand

6

because he broke his right wrist playing basketball in 2005 or 2006. Defense counsel asked Appellant if he had any scars showing that his right hand was injured, and Appellant answered, "yes." Defense counsel then received the trial court's permission to have Appellant show his right hand to the jury. Appellant stepped down from the witness stand, approached the jury, and showed them the surgical scars on his right hand. On cross-examination, the prosecutor said, "You showed the Jury your arm. Show me," and Appellant complied. When asked by the prosecutor if he was saying that he could not lift with his right hand, Appellant responded, "I can."

The prosecutor then asked Appellant, "What are those tattoos on your arm?" and defense counsel immediately said, "Objection, irrelevant." The prosecutor responded, "Judge, he showed the jury on Direct, and I have him on Cross-examination." Defense counsel replied, "I still think [the tattoos are] irrelevant." The trial court overruled the objection without explanation, and the prosecutor again asked, "What are those tattoos on your arm?" Appellant pointed out one tattoo that he said was Rainey's nickname and another that he said was the letter "C," for "Christian." The prosecutor then inquired about tattoos on Appellant's hand, and he testified that they said "Jim" and "Hood."

7

The prosecutor asked what "Jim Hood" means, and Appellant said, "gentlemen everywhere are maintained."[3] The prosecutor asked, "Maintaining what?" and Appellant answered, "You're maintaining self-control, all that."

The discussion continued as follows:

Prosecutor: Don't, I want to see some more of these tattoos that you've shown to the Jury.

Defense counsel: He needs to let him finish explaining.

Prosecutor: Well, actually, he was buttoning up his shirt. If you would, unbutton your shirt.

Appellant: I showed the Jury my scars. That's all they seen.

Prosecutor: What's these tattoos right there (indicating)?

Appellant: They didn't see none of this.

Prosecutor: That's where the scars are. I want to know what they are.

Appellant: The scars are over here (indicating), sir.

Prosecutor: What are these tattoos? What do they mean?

Appellant: Nothing, just go.

Prosecutor: You just go to the tattoo parlor and say, put something on my arm?

Appellant: I mean, if you got the money to do it like that, freehand, yes, sir.

Prosecutor: And that's what you did here?

Appellant: Basically.

Prosecutor: You just said, go in there and put something on my arm?

Appellant: Yes, sir. I was in the detention center, sir. I didn't

---

[3] The transcript indicates that Appellant testified that the tattoo said "Jim," but that is a homonym for "GEM" – "Gentlemen Everywhere are Maintained."

have nothing else to do.[4]

The prosecutor then moved on to a different line of questioning.

On redirect examination, defense counsel referred to Appellant's testimony about the tattoos and asked, "What does maintain mean?" Appellant explained:

> It means basically whatever you got going on, whatever you doing is maintaining, you doing the right thing, basically that's what that's for. If you're doing something wicked or whatever, it's about to go down, that ain't going to last too long, basically self-destruction if you doing wicked.

Defense counsel asked Appellant if he was "maintained" on the night that the victim was taken to the hospital, and Appellant said, "Yes, sir."

There was no further testimony about the tattoos, and the prosecutor never mentioned Appellant's tattoos again during the trial. In his closing argument, however, defense counsel remarked that there was "one tattoo that I think represents [Appellant]. He maintained."

In his motion for new trial, Appellant claimed that the trial court abused its discretion in overruling his objection to the prosecutor's line of questioning

---

[4] During his direct examination, Appellant testified that he pled guilty to a burglary and breaking into a car and served 18 to 24 months in a detention center in 2008.

about the tattoos. In its order denying the motion, the trial court explained its rationale for allowing the questions:

> On cross-examination, the prosecutor inquired as to the condition of defendant's hands he had just shown to the jury. Defense counsel objected, and the prosecutor responded that the defense had opened the door to this line of questioning when he displayed defendant's arms to the jury. The Court agreed and overruled the objection. The defendant opened the door to this line of questioning when he intentionally elected to display the tattooed arm to the jury.

(b) Appellant's trial took place in February 2014, more than a year after Georgia's new Evidence Code took effect. In the new Code, "relevant evidence" is defined in OCGA § 24-4-401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-402 then says:

> All relevant evidence shall be admissible, except as limited by constitutional requirements or as otherwise provided by law or by other rules, as prescribed pursuant to constitutional or statutory authority, applicable in the court in which the matter is pending. Evidence which is not relevant shall not be admissible.

Decisions regarding relevance are committed to the sound discretion of the trial court. See <u>Crayton v. State</u>, ___ Ga. ___, ___ (784 SE2d 343, 349)

10

(2016); United States v. Blasingame, 219 Fed. Appx. 934, 944-945 (11th Cir. 2007). See also United States v. Hurley, 755 F2d 788, 790 (11th Cir. 1985) ("The trial court has broad discretion in determining the relevance and admissibility of evidence"). OCGA § 24-4-401 tracks the language of Federal Rule of Evidence 401 as that rule read in 2011, and so in interpreting our new rule, we properly look to the decisions of the federal appellate courts – particularly the United States Supreme Court and the Eleventh Circuit – interpreting Rule 401, rather than to cases discussing relevance under the old Evidence Code. See Davis v. State, Case No. S16A0103, 2016 WL 3145125, *4 (decided June 6, 2016); State v. Jones, 297 Ga 156, 159 n.2 (773 SE2d 170) (2015).

(c) Whether Appellant was physically able to inflict the victim's injuries was certainly a relevant issue in this case. Thus, it was appropriate for defense counsel to explore that issue on direct examination of Appellant, and to have him show the jury any physical manifestations, such as scars, supporting his testimony. Likewise, it would have been proper for the prosecutor to ask about this topic on cross-examination, even if it had not already been broached on direct.

The relevance of Appellant's tattoos is far less evident. The State concedes that the tattoos were not relevant to the determination of the perpetrator's identity, as tattoos are in some cases. See Blasingame, 219 Fed. Appx. at 944 (holding that a photograph of a defendant's torso showing a gunshot scar and tattoos similar to those witnesses had described was relevant to identify the defendant as the masked gunman). The State instead argues, in line with the trial court's reasoning in the order denying the motion for new trial, that Appellant "opened the door" to cross-examination about his tattoos by showing the jury his right hand and arm up close, which allowed the jury to see the tattoos.[5]

The prosecutor may have had concerns that the jury had seen tattoos on

---

[5] We note that "opening the door" is not a freestanding evidence rule allowing a party to present to the jury otherwise inadmissible evidence; the phrase appears nowhere in the new Evidence Code or in the Federal Rules of Evidence on which our new code was largely based. Instead, "opening the door" is a metaphor used for a variety of situations that arise in criminal and civil trials involving conduct by one party that allows the other party to introduce evidence that otherwise would not be allowed. See generally 21 Kenneth W. Graham, Jr., Federal Practice & Procedure Evidence § 5039.1 (2d ed. Apr. 2016 update). Thus, litigants and trial courts should take care to identify the precise basis in the evidence rules – the ones in our *new* Evidence Code – for an argument that one side has "opened the door" to allow the admission of otherwise inadmissible evidence. See Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 177 n.2 (109 SCt 439, 102 LE2d 445) (1988) (Rehnquist, C.J, concurring in part and dissenting in part) ("[O]ne doctrine which allows even a valid and timely objection to be defeated is variously known as 'waiver,' 'estoppel,' 'opening the door,' 'fighting fire with fire,' and 'curative admissibility.' The doctrine's soundness depends on the specific situation in which it is used and calls for an exercise of judicial discretion.").

Appellant's hand and arm and that the tattoos could depict words or images – say, a tattoo of the victim's name inside a heart – that might influence the jury even though the tattoos were not at that point reflected in the record or admitted as evidence. Any such concerns would have been more properly addressed by the prosecutor asking to examine Appellant's hand and arm before they were displayed to the jury, and raising any objections at that point. Moreover, any such concerns were reduced when, before asking Appellant any questions about the tattoos, the prosecutor demanded that Appellant show the prosecutor his arm, which Appellant did. Only then did the prosecutor ask about the tattoos, drawing defense counsel's relevance objection; without the prosecutor at that point articulating any potential relevance to the tattoos, it would have been appropriate for the trial court to sustain the objection.

But tattoos are often difficult to see clearly and to comprehend, and especially on cross-examination, it may have been within the trial court's broad discretion to allow the prosecutor to ask a few questions to try to establish the relevance of the tattoos, although this also risked eliciting improper evidence and the overruling of the objection should then have been made conditional. See OCGA § 24-1-104 (b). The prosecutor started down this path, simply

asking Appellant to explain what was symbolized by the tattoos the jury may have seen. These questions elicited evidence that benefitted Appellant, which he otherwise might not have been able to introduce – that he had Rainey's nickname tattooed on his harm (indicating a close bond with the victim's mother); that he was a Christian; and that he was focused on maintaining self-control.

By that point, however, it should have been clear that this line of questioning would not develop relevant evidence, and the remaining handful of questions that turned to why and where Appellant got tattoos was rather obviously irrelevant (although they did not provoke a renewed objection from defense counsel). Thus, the trial court abused its discretion by allowing at least some of the questioning regarding Appellant's tattoos.[6]

(d) Nevertheless, we are confident that any such error was harmless. The new Evidence Code continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings. See OCGA § 24-1-103 (a) ("Error

---

[6] Appellant also contends that the prosecutor's line of questioning was improper because its only purpose was "to paint the defendant as a thug," and that the trial court improperly allowed the prosecutor "to bully and badger the defendant about his tattoos." But the only objection Appellant made at trial was to the relevance of the questioning, and the record does not support these additional complaints.

14

shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected . . . ."); Paul S. Milich, Ga. Rules of Evidence § 3:8, at p. 78 n.4 (2015–2016 ed.) (explaining that "[t]he first part of subsection (a) of [OCGA § 24-1-103] incorporates the harmless error doctrine and does not purport to change existing Georgia law on what constitutes harmless error" (citation omitted)). See also 21 Kenneth W. Graham, Jr., Federal Practice and Procedure Evidence § 5032 (2d ed. Apr. 2016 update) ("[Federal Rule of Evidence] 103 rejects the old common law rule requiring automatic reversal for any evidentiary error [,] . . . limiting reversals to cases where an injustice may have been done. . . ."). "In determining whether an error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." Rivera v. State, 295 Ga. 380, 382 (761 SE2d 530) (2014). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." Id. (citation omitted).[7]

---

[7] A stricter test governs the determination of harmlessness when the evidentiary ruling amounts to constitutional error. See Ellington v. State, 292 Ga. 109, 115-116 (735 SE2d 736) (2012) ("'[B]efore a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt'" (quoting Chapman v. California, 386 U.S. 18, 24 (87 SCt 824, 17 LE2d 705) (1967)).

15

The properly admitted evidence proving Appellant's guilt was overwhelming. Several defense witnesses and Appellant himself testified that he was alone with the victim when she started showing symptoms and for some time before then, and the State's witnesses testified that Appellant told them the same thing. No one saw anything wrong with the baby before Appellant went into the room with her, and the medical expert testimony established without contradiction that the baby's symptoms would have been apparent within seconds or at most minutes of the fatal injuries. And Appellant admitted to the treating doctors and in his testimony that he lifted and squeezed the baby – but in ways that were inconsistent and that were contradicted by the medical evidence and could not explain the baby's horrendous injuries.

Moreover, there is little indication that any evidence about Appellant's tattoos that was improperly admitted caused him prejudice, and indeed aspects of the evidence appear to have aided his defense. Thus, while the prosecutor never mentioned the tattoos again after the disputed testimony, defense counsel had Appellant elaborate on his being "maintained" on the night the victim was injured and then reminded the jury of the tattoo evidence in closing argument, using the testimony that the prosecutor had elicited to reinforce the defense's

16

narrative that Appellant was a responsible person who had been a good father to Rainey's older child and the victim and who lived by the motto that he had tattooed on his right hand.

Considering the trial record as a whole, we conclude that it is highly probable that any erroneous evidentiary ruling by the trial court with regard to Appellant's tattoos did not contribute to the jury's verdict. See Rivera, 295 Ga. at 382; Peoples v. State, 295 Ga. 44, 57 (757 SE2d 646) (2014). See also Moore v. State, 294 Ga. 682, 686 (755 SE2d 703) (2014) (holding that the erroneous admission of evidence that the defendant had a tattoo of the same type of gun used in the murder was harmless); Belmar v. State, 279 Ga. 795, 800 (621 SE2d 441) (2005) (same). Accordingly, Appellant is not entitled to a new trial on this ground.

3. Appellant also contends that the trial court abused its discretion in allowing the medical examiner, Dr. Clark, to use a baby doll to demonstrate how some of the victim's injuries appeared to have been inflicted and the amount of force that would have been required to cause the head and neck injuries that he observed when he performed the victim's autopsy. We see no error.

(a) Before Dr. Clark testified, the State advised the trial court that

it planned to have him use a baby doll as a demonstrative aid. Defense counsel objected on the grounds that shaking the doll as a demonstration was not supported by the evidence as Appellant never said that he shook the victim, and that the probative value of the demonstration would be substantially outweighed by the risk of unfair prejudice. In addition, defense counsel requested a preview of the demonstration and a ruling on its admissibility before Dr. Clark conducted the demonstration for the jury. See OCGA § 24-4-103 (c).

The trial court agreed to that procedure. With the jury excused, the State showed Dr. Clark the baby doll to be used in the demonstration, which he confirmed was approximately the same size as the victim, within six inches in length and six pounds in weight. Dr. Clark then explained that it would help the jurors understand his expert testimony if they could see him demonstrate how the baby's injuries were caused – the squeezing of her chest causing the rib fractures, the "slamming of the head [indicating what he meant] several times to cause injury," and the gripping of her leg and arm resulting in the injuries there. After cross- and redirect examination, defense counsel renewed his objection, arguing that the demonstration was speculative and highly prejudicial given "the unknowing or unknowable number of times that it's alleged that this

18

child was hit." The trial court ruled "that the doll can be used as a demonstrative tool in [Dr. Clark's] testimony" because it would be helpful as a[n] aid" to the jury in understanding that testimony.

The jury was brought back to the courtroom, and Dr. Clark was qualified as an expert in the field of anatomic and forensic pathology. Dr. Clark then testified about a series of photographs and x-rays from the autopsy, explaining to the jury what the images showed and how the victim's injuries were most likely inflicted. The doctor also explained that demonstrative aids are helpful in cases of infant fatalities to show the mechanism of causing the injuries presented and the force needed to cause the injuries. He then reviewed the injuries that he had found based on the victim's autopsy and medical records, using the doll to demonstrate what he was describing about the location, manner of infliction, and force necessary to inflict the injuries. This included slamming the doll's head several times against a hard surface to show the approximate force necessary to cause the victim's injuries, and demonstrating how the rib fractures could have occurred by gripping the doll's chest in particular areas. Dr. Clark acknowledged on direct and cross-examination that he could not tell exactly how many impacts there were to the victim's head, but that there were two or

19

three at a minimum and up to seven or eight. He never implicated Appellant or anyone else as the person who inflicted the victim's injuries.

(b) As a leading commentator on the new Evidence Code explains, "[e]vidence is sometimes classified as either 'real,' 'testimonial,' or 'demonstrative' evidence." Milich, supra, § 6:1, at p.119. Real evidence is evidence that the court or jury perceives directly through its senses and that "'speaks to them without the intervention of the testimony of witnesses.'" Id. (citation omitted). Its relevance "lies in its direct relationship to the facts or events in question at trial" – e.g., a package of cocaine that was allegedly seized from the accused, or fingerprints or blood samples allegedly taken from a crime scene. Id. (citation omitted). Testimonial evidence, in this taxonomy, refers to "all testimony at trial and all hearsay statements admitted pursuant to an exception"; relevance depends on its logical relationship to the facts in issue at trial, and its probative force is highly dependent on the credibility of its source. Id.

> Demonstrative evidence is a combination of real and testimonial evidence. It is real evidence in that it "is adduced directly to the senses of the court or jury" but it is irrelevant and inadmissible unless accompanied by witness testimony that shows that the demonstrative evidence is substantially similar to the actual

conditions or events at issue.

Id. (footnote omitted).  Demonstrative evidence includes "charts, models, diagrams, replicas, re-enactments, pictures, or any other device used to aid the trier of fact in understanding the issues and facts at trial."  Id.  See also id. § 10:1, at pp. 215-221 (discussing demonstrative evidence).

Demonstrative evidence implicates several provisions of the new Evidence Code.  It must be relevant, see OCGA § 24-4-401, and it may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence, see OCGA § 24-4-403.  Demonstrations are also subject to the reasonable control of the trial court.  See OCGA § 24-6-611.[8]  See also Michael H. Graham, 2

---

[8] OCGA § 24-6-611, which mirrors Federal Rule of Evidence 611 as that rule read in 2011, says in pertinent part:

>    (a)    The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to:
>           (1)    Make the interrogation and presentation effective for the ascertainment of the truth;
>           (2)    Avoid needless consumption of time; and
>           (3)    Protect witnesses from harassment or undue embarrassment.

The Advisory Committee notes on Federal Rule 611 explain that the rule

restates in broad terms the power and obligation of the judge as developed under

21

Handbook of Federal Evidence § 401:9 (7th ed. Nov. 2015 update)

("Demonstrations . . . are permissible for explanatory purposes but not for

dramatic effect or emotional appeal.").

The Eleventh Circuit has summarized the rules governing the admission

of demonstrations (and experiments) as follows:

> "As a general rule, the district court has wide discretion to admit
> evidence of experiments conducted under substantially similar
> conditions." The burden is on the party offering a courtroom
> demonstration or experiment to lay a proper foundation establishing
> a similarity of circumstances and conditions. Although the
> conditions of the demonstration need not be identical to the event
> at issue, "they must be so nearly the same in substantial particulars
> as to afford a fair comparison in respect to the particular issue to
> which the test is directed." Further, experimental or demonstrative
> evidence, like any evidence offered at trial, should be excluded "if
> its probative value is substantially outweighed by the danger of
> unfair prejudice, confusion of the issues, or misleading the jury."

United States v. Gaskell, 985 F2d 1056, 1060 (11th Cir. 1993) (footnote and

citations omitted).

     (c)    Although this case was tried under the new Evidence Code,

---

common law principles. It covers such concerns as whether testimony shall be in the form of a free narrative or responses to specific questions, McCormick § 5, the order of calling witnesses and presenting evidence, 6 Wigmore § 1867, the use of demonstrative evidence, McCormick § 179, and the many other questions arising during the course of a trial which can be solved only by the judge's common sense and fairness in view of the particular circumstances.

the parties have cited only cases on demonstrative evidence decided under the old Evidence Code. Neither party cites the pertinent provisions of the new Evidence Code, the parallel provisions of the Federal Rules of Evidence, or a single case interpreting the federal or new state rules. As the Court has emphasized, "we are all living in a new evidence world and are required to analyze and apply the new law." Davis, 2016 WL 3145125, at *9. "It may be that the result of this case would be the same if we applied the old Evidence Code and our decisions interpreting it, but if so, that is happenstance, at least without careful comparison of the old and new law." Id.

Applying the new law, we see no abuse of discretion in the trial court's admission of the medical expert's demonstration using the baby doll. Dr. Clark testified during the proffer and before the jury that using the baby doll would be helpful in explaining his opinions to the jury and that the doll used was substantially similar to the victim with respect to the characteristics relevant to the points that his testimony covered. Dr. Clark noted that he had used dolls in similar cases because "the baby doll helps show what the mechanism is that resulted in these types of injuries . . . [and] also will show what kind of force could be involved in these injuries." He then based the demonstration on

23

information that he had derived from the victim's autopsy and medical records, being careful to qualify his testimony where details were uncertain, such as the exact number of blows the victim's head had suffered.

Considering the record as a whole, the trial court's admission of this demonstrative evidence was not abuse of discretion. See Moore v. State, 154 SW3d 703, 707-709 (Tex. Ct. App. 2004) (applying Texas evidence rules based on the federal evidence rules and upholding the admission of a demonstration using a baby doll in a shaken-baby murder case.); Minor v. State, 780 S2d 707, 762-765 (Ala. Crim. App. 1999) (same, applying Alabama evidence rules based on the federal evidence rules), reversed on other grounds, 780 S2d 796 (Ala. 2000). Compare Gaskell, 985 F2d at 1060-1061 (holding that the trial court abused its discretion in admitting a demonstration in a shaken-baby murder trial, where the conditions of the demonstration were substantially dissimilar to the evidence of what happened to the victim, the doll the expert used was dissimilar to the victim in several important respects, and the expert's understanding of how the victim was shaken was based on unreliable information from a different shaken-baby case).

Judgment affirmed. All the Justices concur.