306 Ga. 637
FINAL COPY

S19A0540.  WALKER v. THE STATE.

BOGGS, Justice.

Appellant Orsley Walker appeals his convictions for felony murder and a firearm offense in connection with the shooting death of his girlfriend, 53-year-old Constance Cox. He contends that the trial court erred in denying his motions for a mistrial after the State introduced evidence of hearsay statements by Cox through the testimony of Cox's daughters in violation of a trial court order and that he was denied the effective assistance of counsel due to his trial attorneys' failure to object and move for a mistrial when the State introduced evidence of another hearsay statement by Cox through the testimony of her son-in-law. Appellant also contends that the trial court erred in overruling his objections to the State's line of questioning on redirect examination of the lead detective about the

detective's experiences with suspects in other cases. We affirm.[1]

1.    Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. Appellant and Cox dated for about two years. Eight to ten times a year, Cox would call her younger daughter, Constance Nunnally, upset and sometimes crying, and ask to be picked up from Appellant's house. Nunnally would go or send her husband. About a year before the fatal shooting, Cox called Nunnally, very upset, and asked to be picked up again. When Nunnally's husband arrived at Appellant's house, Cox was crying and very emotional. As Nunnally's husband put it, "You could feel the tension," and because of Cox's crying and

---

[1] The fatal shooting occurred shortly after midnight on the night of December 24-25, 2011. On December 17, 2013, a Fulton County grand jury indicted Appellant for felony murder, aggravated assault with a deadly weapon, and possession of a firearm during the commission of a felony. At a trial from February 9 to 12, 2016, the jury found Appellant guilty of all charges. On February 15, 2016, the trial court sentenced Appellant, who by then was 73 years old, to serve life in prison for felony murder and a suspended consecutive term of five years for the firearm conviction; the aggravated assault verdict merged. On February 29, 2016, Appellant filed a motion for new trial, which he amended with new counsel on May 1, 2018. After an evidentiary hearing, on October 4, 2018, the trial court entered an order denying the motion. Appellant filed a timely notice of appeal, and the case was docketed in this Court for the April 2019 term and submitted for decision on the briefs.

emotional state and the tense atmosphere at Appellant's house, he asked Appellant if Appellant had shot Cox. Appellant replied, "I have the right to defend my house." Nunnally's husband then asked Cox to show him where she was hurt, and she pulled up her shirt, revealing a wound in the middle of her back. He again asked Appellant if he had shot Cox, and Appellant again replied, "I have the right to defend my house." Cox then left with her son-in-law but refused to go to a hospital or police station.

At the time, Nunnally and her husband lived in the apartment directly above Cox's, and he took Cox to their apartment, where Nunnally was waiting. Cox, who was drunk, walked in and stumbled onto the couch. Nunnally saw a hole in the back of Cox's shirt and pulled up the shirt. When Nunnally saw the wound on Cox's back, she said, "We need to call the police and get him locked up." Nunnally called her older sister, Furaha Quinn, who came over. Nunnally, her husband, and Quinn kept checking the wound on Cox's back and tried without success to get Cox to go to the hospital. Nunnally eventually called for an ambulance, but when the

emergency medical technicians ("EMTs") arrived, Cox refused treatment, instead going downstairs to her apartment and closing the door. A couple weeks later, Cox went back to Appellant, and the periodic calls asking to be picked up from his house resumed.

On Christmas Eve 2011, Appellant and Cox went to a get-together at the home of Michael Perkins, Appellant's friend of 30 years. On the way there, Appellant and Cox stopped at a liquor store. They bought cigarettes and what Appellant and Perkins described as "Christmas liquor" — a pint of brandy and a 12-pack of beer for Appellant and Cox to share on Christmas Day. Appellant and Cox spent the next several hours getting drunk with Perkins. Cox, who was described by a friend as "very loving" when she drank, went out to Appellant's car several times to get beer. Around midnight, Appellant and Cox left Perkins' house and got into an argument in the car. Cox asked Appellant to drop her off at her apartment, which was not far from Perkins' house. Appellant drove to the apartment complex and pulled into a parking space, and Cox got out of the car. She then went into the back seat and picked up

her purse, what was left of the box of beer, the pint of brandy, and the bag containing the cigarettes. Appellant said, "You can't take this here," and tried unsuccessfully to stop her. Appellant then got out of the car with his loaded .38 revolver and confronted Cox. During the confrontation, he pulled the trigger on the revolver once, shooting Cox in the face at close range. The bullet traveled straight through Cox's head and lodged in the back of her brain, instantly incapacitating her. Appellant then walked back to his car, put the gun inside, and got out his cell phone. Appellant called Perkins and said that he had just shot Cox, and Perkins told him to hang up and call 911.

Appellant called 911 from his cell phone at 12:15 a.m. on Christmas Day. He told the 911 dispatcher, "I just shot my girlfriend," repeating the same sentence twice more. Appellant told the dispatcher that he thought Cox was dead and said, "I'm the one that shot her. I'm the one that shot," but he claimed that Cox "started fighting and tried to take the, take the gun away from me and it went off and it hit her in the head." Appellant said, "I'll tell

5

the police what happened," gave the dispatcher the address, and described his car and what he was wearing. Appellant was still on the phone with 911 when the police arrived. No blood was visible on Appellant, he did not appear to be injured, and the police took him into custody. Cox was pronounced dead at the hospital at 12:45 a.m. Nunnally and her husband were still up wrapping Christmas presents at their house when Nunnally's aunt came to get Nunnally and take her to the hospital.

A few hours after the shooting, Appellant waived his *Miranda* rights and spoke with J. Thorpe, Jr., the lead detective on the case. See *Miranda v. Arizona*, 384 U.S. 436 (86 SCt 1602, 16 LE2d 694) (1966). In the interview, which was video-recorded, Appellant claimed that when he told Cox to stop after she picked up her purse, the pint of brandy, the box of beer, and the bag with the cigarettes from the back seat, she "turned around," walked back to the car, opened the console in the front seat, and took out his .38 revolver. Appellant told Detective Thorpe, "Hey, I didn't want her to get ahold of that pistol." Appellant claimed that he climbed over the console

and clambered out the passenger-side door after Cox and "took the pistol away from her." Appellant said that the two of them were "out there in that parking lot," and he heard a loud bang and saw Cox fall down.

At trial, the medical examiner who performed the autopsy on Cox testified that there was a ring of gunpowder and soot around the entry wound on Cox's face, which meant that the revolver was within a few inches of her face when it was fired. An expert in firearms identification testified that due to rust, dirt, and debris on the double-action revolver, it would have taken an unusually large amount of pressure — more than 15 pounds — to pull the trigger without the hammer cocked, but only 3.5 pounds of pressure to pull the trigger if the hammer was cocked. The State played an audio recording of the 911 call and the video recording of Appellant's interview for the jury, and numerous photographs of the crime scene showing the locations of the various objects that Cox picked up out of the back seat were admitted into evidence. In addition, Nunnally,

Quinn, and a childhood friend of Cox testified that they had never seen Cox with a gun.

Appellant did not testify at trial. The defense's theory was that the shooting was an accident and that the revolver went off during a struggle as Appellant tried to take it away from Cox for her own safety. The jury was instructed on accident.

Appellant does not contest the legal sufficiency of the evidence supporting his convictions. Nevertheless, in accordance with this Court's practice in murder cases, we have reviewed the record and conclude that, when viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient to authorize a rational jury to find Appellant guilty beyond a reasonable doubt of the crimes for which he was convicted. See *Jackson v. Virginia*, 443 U.S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citations omitted)).

2. Appellant's arguments on appeal primarily relate to hearsay statements that Cox made after she was wounded in the back at Appellant's house about a year before the fatal shooting. Before trial, the State filed a notice of intent to introduce evidence of several of those statements under the residual exception to the rule against hearsay, OCGA § 24-8-807.[2] The relevant parts of the notice said that the State intended to present testimony from Nunnally that Cox refused treatment when the EMTs arrived at the Nunnallys' apartment; testimony from Quinn that Cox said that Appellant shot at her but missed; and testimony from Nunnally's

---

[2] OCGA § 24-8-807 says:

A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not be excluded by the hearsay rule, if the court determines that:
(1)     The statement is offered as evidence of a material fact;
(2)     The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and
(3)     The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence.
However, a statement may not be admitted under this Code section unless the proponent of it makes known to the adverse party, sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

9

husband that Cox told him when he arrived at Appellant's house that Appellant had fired a shot at her. In a motion in limine concerning other matters, Appellant responded to the State's notice.

After jury selection but before opening statements, the trial court heard argument on the State's notice and Appellant's response. The court took the issue under advisement during a lunch recess and then entered a written order finding that Cox's hearsay statements lacked sufficient circumstantial guarantees of trustworthiness to be admitted into evidence under OCGA § 24-8-807. The order concluded, "the State's request to introduce the statements [by Cox] referred to in the Notice is denied." After a brief recess to prepare its witnesses, the State sought clarification of the court's order. The State said that it still intended to call Nunnally, her husband, and Quinn, "not to get into any hearsay," but to testify "about their observations, what they saw." Appellant responded that the State would be well within its rights to do so, and the court then said, "They can testify to the facts of what they know." After another

10

short recess for the State to prepare its witnesses, the parties made their opening statements to the jury.

(a) Appellant first argues that the trial court erred in denying his motions for a mistrial after the State introduced evidence of hearsay statements by Cox through the testimony of Nunnally and Quinn. "Whether to declare a mistrial is a question committed to the discretion of the trial judge . . . ." *Wilson v. State*, 295 Ga. 84, 88 (757 SE2d 825) (2014) (citation and punctuation omitted). We see no abuse of discretion.

(i) Nunnally testified on direct examination that after the incident about a year before Cox's death, she ended up calling an ambulance for Cox. The State asked Nunnally, "What, if anything, happened after that?," and Nunnally said, "They came, [and] she refused to go with them." Appellant immediately made a hearsay objection and indicated to the court that he had a motion to make outside the presence of the jury. The State disputed that the testimony was hearsay, arguing that what Nunnally was referring to was what she saw Cox do when the EMTs arrived, not necessarily

11

what Cox said. Appellant replied, "[Y]ou do it by saying something." The court then excused the jury and Nunnally, and Appellant moved for a mistrial on the ground that the testimony violated the court's order on the State's notice. After hearing arguments, the court denied the motion, explaining that "you can refuse by your actions without having to say a word." When the jury and Nunnally returned to the courtroom, the State asked, "[W]hen you say your mom refused treatment[,] without saying anything she said, what, if anything, did she do?" Nunnally replied that Cox, despite the EMTs' entreaties to go with them due to the risk of imminent infection, "continued to try to make her own way back to [her] apartment. We eventually let her go. She went to her apartment and . . . she wouldn't even answer the door for like two days for us."

Quinn testified on direct examination that when she went to the Nunnallys' apartment, she "observed" that Cox was upset, appeared to have been drinking, and had an injury "[a]long the spinal center of her back." The State asked Quinn if she saw or spoke to Cox on the day that Cox died, and Quinn said, "No." The State

then asked, elliptically, "How did you learn?," and Quinn replied that she received a phone call from her aunt. The State said, "Without going into what your aunt said, what was your response?," and Quinn answered, "Let me know how she is, and that was it." The State asked, "Why did you respond that way?," and Quinn replied, "Because she had been through it before and I just didn't think it was serious." The State said, "When you say 'through it before,' [do you mean] with this defendant?," and Quinn answered, "Yes." Appellant then made a hearsay objection and indicated to the court that he had another motion to make outside the presence of the jury. The court excused the jury and Quinn, and Appellant moved for a mistrial on the ground that the testimony violated the court's order on the State's notice. Appellant argued that the "it" in Quinn's testimony that Cox "had been through it before" was a reference to the fact that Appellant shot Cox about a year before the fatal shooting, which Appellant claimed Quinn knew about only from what Cox told her at the time. The State responded in part that Quinn's testimony was based not on anything that Cox said, but

instead on what Quinn had just told the jury that she observed at the Nunnallys' apartment. The trial court denied the motion without explanation.

(ii) Appellant argues that the trial court abused its discretion in denying his mistrial motions because Nunnally's testimony that Cox "refused" to go with the EMTs, and Quinn's testimony that Cox "had been through it before" with Appellant, violated the court's order on the State's notice. We disagree.

Recall that the trial court's order concluded, "the State's request to introduce the statements [by Cox] referred to in the Notice is denied." Specifically, the State's notice of intent to introduce certain hearsay statements by Cox said that Nunnally would testify that Cox refused treatment when the EMTs arrived at the Nunnallys' apartment and that Quinn would testify that Cox said that Appellant shot at Cox but missed. But at trial, Nunnally did not testify that Cox said that she did not want medical treatment or that Cox told the EMTs to go away. Instead, she testified that Cox "refused to go with them [i.e., the EMTs]," and as the trial court

correctly explained, "you can refuse by your actions without having to say a word" — which the evidence showed that Cox did. Thus, contrary to Appellant's argument, and as the trial court found, Nunnally's testimony that Cox "refused" to go with the EMTs did not violate the court's order on the State's notice.[3] Cf. *Kirby v. State*, 304 Ga. 472, 477-478 (819 SE2d 468) (2018) (holding that testimony that ring had jewelry manufacturer's mark was hearsay when offered to prove ring had mark and testimony made clear that witness had no personal knowledge of mark and knew about it solely based on someone else's statement to her). It is not an abuse of discretion to deny a motion for a mistrial based on an alleged violation of an order that was not violated. See *Allen v. State*, 296 Ga. 785, 787 (770 SE2d 824) (2015) (finding no abuse of discretion

---

[3] Appellant did not argue in the trial court that Cox's conduct was a statement covered by the court's order. See OCGA § 24-8-801 (a) (2) (defining "[s]tatement" to include "[n]onverbal conduct of a person, if it is intended by the person as an assertion"). See also *State v. Orr*, 305 Ga. 729, 740-741 (827 SE2d 892) (2019) (noting that "the key to the definition of 'statement' is that nothing is an assertion unless intended to be one, [such as] . . . the act of an eyewitness pointing to identify a suspect in a lineup as the perpetrator of a crime" (citation and punctuation omitted)).

15

in denial of mistrial motion for alleged violation of order when no violation of order was shown).

Appellant's argument concerning Quinn's testimony that Cox "had been through it before" with Appellant fails for the same reason. The State's notice said that Quinn would testify that Cox told her that Appellant shot at Cox but missed. But Quinn did not testify about anything that Cox said to her. Instead, Quinn testified that when her aunt called her on the day that Cox died, Quinn's only response to her aunt was, "Let me know how she is." When the State asked why, Quinn testified that Cox "had been through it before" with Appellant and that Quinn therefore did not think that the situation was serious. Quinn knew from her own observations at the Nunnallys' apartment, which she had just recounted to the jury, that Cox sustained a serious but non-fatal back wound at Appellant's house about a year before the fatal shooting. Quinn also had personal knowledge that Cox went back to Appellant after that incident, which she told the jury. Cf. *Kirby*, 304 Ga. at 477-478. The trial court was authorized to conclude that Quinn's testimony about

16

why she reacted to her aunt's call the way she did suggested that her lackadaisical response — just "[l]et me know how she is" — reflected not a lack of concern for her mother, but rather resignation about the choice that Cox had made to stay with Appellant. Thus, contrary to Appellant's argument, Quinn's testimony that Cox "had been through it before" with Appellant did not violate the court's order on the State's notice, and the trial court therefore did not abuse its discretion in denying his mistrial motion. See *Allen*, 296 Ga. at 787.

(b)  Appellant next argues that he was denied the effective assistance of counsel due to his trial attorneys' failure to object and move for a mistrial when the State introduced evidence of another hearsay statement by Cox through the testimony of Nunnally's husband. To prevail on this claim, Appellant must prove both that his counsel's performance was professionally deficient and that the deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U.S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Appellant must show that his

17

counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish prejudice, Appellant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. A reviewing court need not "address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697.

At trial, Nunnally's husband testified that when he arrived at Appellant's house, Cox was crying and very emotional, and the atmosphere was very intense, which prompted him to ask Appellant if he had shot Cox, to which Appellant replied that he had a right to defend his house. Nunnally's husband further testified that after Cox pulled up her shirt and he saw the wound on her back, he again asked Appellant if Appellant had shot Cox, and Appellant again replied that he had a right to defend his house. Appellant contends that his trial attorneys were professionally deficient in failing to

make a hearsay objection and move for a mistrial on the ground that the testimony of Nunnally's husband that he twice asked Appellant if Appellant shot Cox violated the court's order on the State's notice.

The State's notice of intent to introduce hearsay statements by Cox said that Nunnally's husband would testify that Cox told him when he arrived at Appellant's house to pick her up about a year before the fatal shooting that Appellant had fired a shot at her. And the trial court's order concluded, "the State's request to introduce the statements [by Cox] referred to in the Notice is denied." Appellant contends that the testimony of Nunnally's husband that he twice asked Appellant if Appellant had shot Cox violated the court's order, because the only way that Nunnally's husband knew to ask Appellant that question was because Cox had told him that Appellant fired a shot at her. But Nunnally's husband testified that what prompted him to ask Appellant if Appellant had shot Cox was Cox's crying and emotional state and the tense atmosphere at Appellant's house.

Moreover, aside from certain unusual circumstances — for example, questions of the infamous "When did you stop beating your wife?" variety[4] — questions are not hearsay, because they do not assert anything, nor are they intended as assertions. See OCGA § 24-8-801 (a) (1), (2); *United States v. Lewis*, 902 F2d 1176, 1179 (5th Cir. 1990) ("The questions asked by the unknown caller, like most questions and inquiries, are not hearsay because they do not, and were not intended to, assert anything."). Thus, Nunnally's husband's testimony that he twice asked Appellant if Appellant had shot Cox was not hearsay, so there was no basis for a hearsay objection, and the failure to make a meritless objection is not deficient performance. See *Watson v. State*, 303 Ga. 758, 763 (814 SE2d 396) (2018). Likewise, Appellant's trial counsel were not professionally deficient in failing to make a mistrial motion based

---

[4] See *United States v. Felix-Jerez*, 667 F2d 1297, 1303 (9th Cir. 1982) (referring to "the well known cliche question of 'When did you stop beating your wife?'"). See also *United States v. Check*, 582 F2d 668, 678 (2d Cir. 1978) (finding, after extensively quoting prosecution's examination of undercover officer who was prosecution's principal witness, that "for much of his testimony [the officer] was serving as a transparent conduit for the introduction of inadmissible hearsay information obviously supplied by and emanating from the informant," who did not testify at trial).

on a violation of the court's order, because the testimony by Nunnally's husband did not violate the order, so a mistrial would not have been warranted. See *Koonce v. State*, 305 Ga. 671, 676 (827 SE2d 633) (2019). Accordingly, Appellant's ineffective assistance of counsel claim fails.

3. Finally, Appellant contends that the trial court erred in overruling his relevancy objection to the State's line of questioning to the lead detective on redirect examination about his experience with suspects in other cases. "Decisions regarding relevance are committed to the sound discretion of the trial court," *Smith v. State*, 299 Ga. 424, 429 (788 SE2d 433) (2016), and we see no abuse of discretion.

OCGA § 24-4-401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401 tracks the language of Federal Rule of Evidence 401 as that rule read in 2011, so in interpreting OCGA § 24-4-401, "we properly look

21

to the decisions of the federal appellate courts — particularly the United States Supreme Court and the Eleventh Circuit — interpreting Rule 401, rather than to cases discussing relevance under the old Evidence Code." *Smith*, 299 Ga. at 430. "The fact to which the evidence is directed need not be in dispute." Federal Rule of Evidence 401, Advisory Committee Note.[5]

On cross-examination, Appellant questioned the lead detective at length about the fact that on the night of the fatal shooting, Appellant called 911, waited for the police to arrive on the scene, and agreed to give a custodial statement. On redirect examination, the State asked the lead detective roughly how many arrests he had made in his career, if suspects always run, if Appellant was his first murder suspect who was still on the scene when he arrived, if Appellant was the detective's first defendant to sit down and give a

---

[5] Put another way, "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." That is how Federal Rule of Evidence 401 now puts it, following a rewording in December 2011 as part of a general restyling of the federal court rules designed to make them easier to understand without altering the result of any ruling on the admissibility of evidence. See *Parker v. State*, 296 Ga. 586, 592 n.10 (769 SE2d 329) (2015).

cooperative statement or agree to be videotaped, and if this was the first time that the detective had sought an arrest warrant after a defendant gave a statement. Appellant objected to each of the State's questions on the ground that it called for irrelevant information, but the trial court denied his objections and allowed the lead detective to answer.

Appellant asked the lead detective a series of questions on cross-examination designed to suggest that Appellant's claims about how the fatal shooting occurred should be believed, because he stayed on the scene instead of fleeing and cooperated with the police, and he therefore must have had nothing to hide, which is how Appellant framed the information in his opening statement. The State responded on redirect examination with a brief series of questions to the lead detective about his experience with suspects in other cases. The trial court did not abuse its discretion in overruling Appellant's relevancy objections to this brief line of questioning, which was designed to elicit testimony that undermined the strength of the inferences that the defense was asking the jury to

23

draw from Appellant's actions. See *Jones v. State*, 305 Ga. 750, 754 (827 SE2d 879) (2019) (holding that trial court did not abuse its discretion in allowing lead detective to testify about whether it was common for investigators to have to seek out witnesses in homicide cases). See also *Strother v. State*, 305 Ga. 838, 845 (828 SE2d 327) (2019) (explaining how evidence not otherwise relevant can "'bec[o]me relevant,'" or be "made relevant," as result of how trial unfolds).

*Judgment affirmed. All the Justices concur.*

DECIDED SEPTEMBER 3, 2019.

Murder. Fulton Superior Court. Before Judge Campbell.

*Jerry W. Chappell II*, for appellant.

*Paul L. Howard, Jr., District Attorney, Lyndsey H. Rudder, Stephany J. Luttrell, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Scott O. Teague, Assistant Attorney General*, for appellee.