311 Ga. 875
FINAL COPY

S21A0288.  MERRITT v. THE STATE.

MELTON, Chief Justice.

Following a jury trial, Shay Alexander Merritt was convicted of malice murder and related offenses in connection with the shooting death of his wife, Rita Ann Merritt.[1]  On appeal, Merritt raises six claims of trial court error and further argues that the evidence was insufficient to support his convictions and that he was

---

[1] On March 20, 2012, a Polk County grand jury indicted Merritt for malice murder, felony murder predicated on aggravated assault, aggravated assault family violence, possession of a firearm during the commission of a felony, and cruelty to children in the first degree.  At a July 28 through August 19, 2014 jury trial, Merritt was found guilty of all charges.  He was sentenced to life in prison without the possibility of parole for malice murder, twenty consecutive years for cruelty to children, and five consecutive years for the firearm charge.  The remaining counts were either merged for sentencing purposes or vacated by operation of law.

Merritt, through new counsel, filed a motion for new trial on September 2, 2014.  However, counsel withdrew from representation on November 24, 2014, and another attorney filed an entry of appearance on March 21, 2016.  That new counsel amended Merritt's motion for new trial on June 28, 2019.  After a hearing, the trial court denied the motion as amended on February 10, 2020.  Merritt timely filed a notice of appeal to this Court.  The appeal was docketed to the term of this Court beginning in December 2020 and was submitted for a decision on the briefs.

denied constitutionally effective assistance of counsel. For the reasons set forth below, we affirm.

1. Merritt contends that the evidence presented at trial was constitutionally insufficient to sustain his convictions. When evaluating the sufficiency of evidence as a matter of constitutional due process, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Citation and emphasis omitted.) *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979). "This Court does not reweigh evidence or resolve conflicts in testimony; instead, evidence is reviewed in a light most favorable to the verdict, with deference to the [factfinder's] assessment of the weight and credibility of the evidence." (Citation and punctuation omitted.) *Hayes v. State*, 292 Ga. 506, 506 (739 SE2d 313) (2013).

Viewed in this light, the evidence presented at trial showed that Merritt and Rita were married and had three children at the

2

time of her death. Their relationship was tumultuous and included numerous incidents of Merritt's physical and verbal abuse of Rita. During the evening hours of September 17, 2011, Merritt shot Rita in the back of her head in front of the couple's then three-year-old daughter. After the shooting, Merritt called 911 and reported that Rita had committed suicide. When local law enforcement officers arrived at the scene, they found Rita leaning against a wall covered in blood. A KFS 7.62 x 39 semi-automatic rifle was lying on the floor behind her, a single shell casing was on the floor in front of her, and a bullet fragment was located along the wall behind the television cabinet on Rita's right side. Sometime thereafter, the Polk County coroner arrived. Upon observing the scene, blood spatter patterns, and Rita's gunshot wound, the coroner opined that "[t]here[ was] no physical way [Rita] could have shot herself behind the ear with that rifle," and advised that the GBI be contacted to assist with the investigation. While he was at the residence, the coroner overheard Merritt state, "I f**ked up," and admit that "he had done this and they might as well put the handcuffs on him."

When the GBI crime scene investigator arrived on the scene, she noted large amounts of blood spatter on the wall, television and cabinet, and a video game console near Rita's body, as well as brain matter and a piece of Rita's jaw on the floor. The crime scene investigator testified that there was no evidence to suggest that any kind of fight or altercation had occurred at the residence and further opined that the physical evidence did not support a conclusion that Rita had committed suicide. The crime scene investigator collected the rifle, bullet fragment, and shell casing, and sent them for further testing.

A GBI firearms examiner testified that the rifle was operational, functioned properly, and did not accidentally misfire or discharge. The firearms examiner opined that the rifle required four and three-quarter pounds of pressure to pull the trigger, and further concluded that the rifle fired the shell casing and bullet fragment that were found at the scene.

After the shooting, Merritt's then three-year-old daughter told her aunt that Merritt shot Rita and that she saw her mother's

4

"brains and blood splattered all over the walls."  The child was taken to a child advocacy center, and, during her forensic interview, she stated that Merritt was yelling "bad words" at Rita prior to the shooting, that Merritt was standing in the kitchen when he picked up a gun and shot Rita, and that Rita was turned away from the gun when she was shot.

During a custodial interview, Merritt told officers the following story.  On the night of Rita's death, he and Rita got into an argument after she came home from a restaurant drunk.  Rita physically attacked him as he was trying to leave the house and, at one point, lunged for a nearby gun that Merritt had not put away after target practice earlier in the day.  He grabbed the gun, not because he believed Rita was going to shoot him, but because he was afraid Rita would harm herself.  Rita sat down on the floor but continued to grab for the gun and, during one of her attempts, the gun accidentally fired.

The medical examiner who conducted Rita's autopsy opined at trial that her death was a homicide and that she died as a result of

the gunshot wound to her head. The medical examiner concluded that the bullet that caused Rita's death traveled from behind her left ear, through her brain stem, and exited out of the front of her head at her right jaw near her right ear. The autopsy revealed no other wounds or injuries that were consistent with a physical struggle. The medical examiner opined that the gunshot wound was consistent with Rita sitting on the floor with her head turned so that she was facing away from the gun when it was fired.

The State also presented the testimony of a GBI expert in blood spatter and crime scene reconstruction. The expert opined that, based upon the blood spatter patterns, the location of Rita's gunshot wound, and the physical evidence found at the scene, Rita was sitting on the floor next to the television cabinet, in an upright position with her legs crossed, and that her head was turned away from the gun when she was shot. The expert testified that Merritt's statement to officers recounting how the shooting occurred was not consistent with the physical and forensic evidence found at the scene.

6

The State also presented evidence that Rita told her friends and family about instances of physical abuse she suffered at Merritt's hands. In addition, witnesses testified about numerous occasions when they either directly witnessed instances of physical and verbal abuse or saw Rita bleeding or with fresh bruises that Rita said Merritt inflicted from incidents of domestic violence. Prior to her death, Rita told a friend and her family members that she feared that if she left Merritt, he would kill her. The State also introduced a certified copy of Merritt's September 2008 conviction for simple battery for "grabbing, pushing, and choking" Rita's sister, Felicia Mercer.

Merritt did not testify at trial. His defense was based on the theory that the shooting was an accident. Based on the evidence presented at trial, the jury was authorized to reject Merritt's accident theory and find him guilty of the crimes of which he was convicted beyond a reasonable doubt. See *Jackson*, supra, 443 U. S. at 319 (III) (B). See also *Jones v. State*, 292 Ga. 656, 658 (1) (a) (740 SE2d 590) (2013) (criminal intent is a question for the factfinder,

7

and can be inferred from the defendant's conduct before, during, and after the commission of the crimes).  Accordingly, the evidence was sufficient to support Merritt's convictions.

2.   Merritt claims that he received constitutionally ineffective assistance of counsel because his trial counsel failed to object to the introduction of Merritt's 2008 simple battery conviction as improper character evidence pursuant to OCGA § 24-4-404 (b) ("Rule 404 (b)").  However, at the hearing on Merritt's motion for new trial, defense counsel informed the trial court that he was abandoning this claim of ineffective assistance.  In its order denying the motion for new trial, the trial court noted that counsel had waived this claim of ineffective assistance and did not issue a ruling on the allegation of error.  Accordingly, this claim is not preserved for appellate review.  See *Prince v. State*, 295 Ga. 788, 793 (2) (b) (764 SE2d 362) (2014) (claim of ineffective assistance not preserved where defendant failed to raise the issue in his amended motion for new trial, failed to raise the claim at the hearing on that motion, and failed to obtain a ruling on it from the trial court).

3. Merritt raises two allegations of error regarding the trial court's evidentiary rulings pursuant to OCGA § 24-6-622 ("Rule 622") ("The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury."). Specifically, Merritt alleges that the trial court erred by (a) allowing the State to cross-examine a defense witness, Dr. Muhammad Abbasi, about the witness's prior arrest, and (b) excluding evidence that Rita and her family were Romanichal gypsies. We review the trial court's rulings on the admissibility of evidence for a clear abuse of discretion. See *Davis v. State*, 301 Ga. 397, 399 (2) (801 SE2d 897) (2017). However,

> even where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a "substantial right," and thus harm, the defendant. See OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected. . . ."); see also *Smith v. State*, 299 Ga. 424, 431 (788 SE2d 433) (2016) (OCGA § 24-1-103 (a) "continues Georgia's existing harmless error doctrine for erroneous evidentiary rulings"). "'In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so,'" and we assess "'whether it is highly probable

9

that the error did not contribute to the verdict.'" *Smith*, 299 Ga. at 432 (quoting *Rivera v. State*, 295 Ga. 380, 382 (761 SE2d 30) (2014)).

*Venturino v. State*, 306 Ga. 391, 393 (2) (830 SE2d 110) (2019). With these principles in mind, we address Merritt's claims of evidentiary error in turn.

(a) At trial, Merritt called Dr. Abbasi, a psychiatrist, as a defense witness to testify about Rita's diagnosis with and treatment for bipolar disorder. During direct examination, Dr. Abbasi explained bipolar disorder to the jury, testified about the medications he prescribed for Rita and how those medications worked to treat bipolar disorder, testified regarding the consequences of a person's failure to take his or her prescribed medications, and testified that it is common for a person diagnosed with bipolar disorder, such as Rita, to threaten to commit suicide.

On cross-examination, the prosecutor asked Dr. Abbasi whether he was biased against the State, to which Dr. Abbasi said he was not. The prosecutor asked to approach the bench and, during a bench conference, informed the trial court of his intention to ask

10

Dr. Abbasi about whether he had been arrested in 2008 for sexual battery against his patients. Defense counsel objected, arguing that this constituted inadmissible impeachment evidence because there was no conviction, pending charge, or indictment. The prosecutor requested to make a proffer outside the presence of the jury, during which the prosecutor asked Dr. Abbasi, "Are you the same Dr. [Muhammad] Abbasi of Covington Alliance Family Practice [in Covington, Georgia] that was arrested for sexual battery back in 2008?" to which Dr. Abbasi responded, "That's right." After making this brief proffer, the State argued that the testimony was relevant to test the doctor's bias pursuant to Rule 622. The trial court agreed, overruled Merritt's objection, and allowed the prosecutor to pursue that line of questioning.

The prosecutor continued his cross-examination of Dr. Abbasi, during which the following transpired:

Q: Dr. Abbasi, my last question to you was whether or not you had any bias — whether you harbored any bias against the state prosecution. I believe you indicated no. That was your answer?

A: That's right.

11

Q: My question to you then is, are you the same doctor who was — who has been accused of sexually inappropriately touching some of your patients at your facility?

A: You said patients?

Q: Yes.

A: Not true.

The prosecutor moved on to a new line of questioning, and the jury was not given an instruction concerning the limited purpose of this testimony.

(i) *Abuse of Discretion.*

Merritt argues that the trial court abused its discretion by allowing the State to question Dr. Abbasi concerning the accusation of sexual battery. As an initial matter, because Rule 622 is a "holdover" from Georgia's old Evidence Code with no federal counterpart, this Court "look[s] to Georgia cases decided under the former version of that rule — OCGA § 24-9-68 — for guidance." *Chrysler Group v. Walden*, 303 Ga. 358, 363 (II) (A) (812 SE2d 244) (2018). In *Chrysler*, this Court looked to cases decided under former OCGA § 24-9-68 and determined that proper applications of this rule of evidence

> included the ability to question an opposing party's expert witness about how often he had been hired by the counsel in the case and how much he had been paid, to question witnesses about reduction in prison time in exchange for cooperating with the State, and to elicit evidence that an employee witness received a promotion and pay increase as a reward for favorable testimony to defendant.

(Citations omitted.) Id. at 364 (II) (A). We also explained that, while Rule 622 "establishes that a witness's bias is always a legitimate issue to be proved," it does not provide "that any evidence offered to show bias is always admissible no matter how prejudicial or irrelevant to the issue being tried." Id. Instead, evidence admitted pursuant to Rule 622 is subject to the familiar balancing test laid out in OCGA § 24-4-403 ("Rule 403") ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.").

Reviewing the testimony at issue in this light, we agree with Merritt that the trial court abused its discretion by allowing the State to question Dr. Abbasi about the prior allegation of sexual

13

battery.  Assuming that this testimony could conceivably be viewed as relevant to show bias, the trial court abused its discretion by allowing this testimony because the probative value of the evidence was substantially outweighed by its unfair prejudicial effect under Rule 403.  This was not a case where the witness was facing a pending criminal charge and the jury was instructed on the limited purpose of such evidence to show bias.  See *Lee v. State*, 306 Ga. 663 (4) (832 SE2d 851) (2019) (no abuse of discretion where the trial court allowed the State to cross-examine a defense witness about a pending criminal indictment brought by the same prosecuting office and instructed the jury that the limited purpose of the evidence was to show bias against the State); *Smith v. State*, 276 Ga. 263, 265 (2) (577 SE2d 548) (2003) (a defendant has the right to show possible bias of a witness in favor of the State by cross-examining that witness about pending criminal charges or a pending probation revocation).  Instead, the State's single question about an unconfirmed allegation of sexual battery that had occurred on an unidentified date did very little to show how Dr. Abbasi may have

14

been biased against the State, and a claim that a doctor had committed sexual battery against his patients is clearly prejudicial. Accordingly, the minimal probative value of the evidence was substantially outweighed by its unfair prejudicial effect; therefore, the trial court abused its discretion in allowing this testimony.

(ii) *Harmless Error.*

However, in light of the strong evidence of guilt in this case, because Dr. Abbasi's testimony did not directly relate to Merritt's defense of accident, and because Dr. Abbasi's answer indicated that the allegations were not true, we conclude that the error was harmless, as it is highly probable that the State's brief questioning of Dr. Abbasi regarding the prior allegation of sexual battery did not contribute to the jury's verdict.

(b) Merritt argues that the trial court erred in excluding evidence under Rule 622 that Rita and her family were Romanichal gypsies. We see no error.

Prior to trial, the defense filed a motion seeking to elicit testimony at trial from Rita's family concerning their Romanichal

culture and its alleged dislike of outsiders, such as Merritt. Defense

counsel argued that this line of questioning was permissible in order

to show the family's bias against Merritt. After hearing arguments,

the trial court ruled as follows:

> I'm going to allow you to do that, but the issue is not with
> the family. The issue is with Rita and what kind of
> relationship she had with [Merritt] in the way of prior
> conflicts, what generated that, whether it be family or
> whatever the case is. I'll allow you to cross-examine any
> witness put up with regard to bias.

At trial, during the defense's cross-examination of Rita's sister,

Felicia Mercer, defense counsel questioned Mercer extensively about

her family background. When counsel began asking about the

women's cultural upbringing, however, the State objected. Defense

counsel stated that she was entitled to ask questions "to show the

bias of the witnesses against [Merritt] and why [the witnesses are]

saying the things that they're saying about him." The trial court

ruled that it would

> allow [defense counsel] to ask the questions pertaining to
> the family's bias or prejudice against [Merritt], but I'm
> going to instruct you not to go into ethnic background or
> anything of that nature as cultural bias of some kind. But

16

I will – I will allow you to ask all of the questions that you indicated that you were trying to probe into with regard to prejudice or bias, and then I'll allow you to ask her why. But I'm not going to turn this into a case against Gypsies or whatever culture we're talking about. . . . I'm going to allow you to go into prejudice or bias, but I'm not going to allow you to do it based on cultural background. And if you get into that, I'll simply stop it and let you make your proffer and that will end it. . . . Because I'm inclined to agree with [the State] that the purpose of those kind of questions has nothing to do with the legitimate effort to show bias or prejudice. It's simply for the purpose of the [sic] prejudicing this jury with regard to the victim's cultural background, if it is.

Defense counsel then continued to cross-examine Mercer about her family's background and Rita's upbringing, but counsel did not attempt to ask any additional questions about the family's Romanichal background, nor did counsel make a proffer as to this witness on the same.

Later, during counsel's cross-examination of Rita's sister-in-law, Louann Jeffrey, counsel made a proffer outside the presence of the jury concerning the family's Romanichal culture and their alleged cultural bias against outsiders like Merritt. During this proffer, Jeffrey testified that she and her family were Romanichal

17

gypsies, that Rita was raised as such, and that a person outside the Romanichal culture is called a "gorgia." The proffer ended with the following exchange:

COURT: If you married someone like me who, to my knowledge, has no gypsy culture in my background, have you sinned in some kind of way or —

JEFFREY: No.

COURT: Is your family going to be prejudiced against mine?

JEFFREY: I'm not shunned against or nothing, no. Maybe in 1905. . . . But today, no. . . .

DEFENSE: Is it expected in the gypsy culture that the gypsies will marry other gypsies?

JEFFREY: It's like, you know, we try to keep our bloodline, and our race is fading, as with any other race. You want to try to keep your bloodline strong. But I feel like if you fall in love with somebody, love is no boundary.

DEFENSE: And you would say that gypsies see everyone who's not a gypsy as an outsider?

JEFFREY: Not so much a[n] outsider, just not a gypsy.

After hearing this testimony, the trial court concluded that questions about the family's cultural background were not relevant to the case, and "any relevance it may have is far outweighed by . . . the prejudice that will be created just because you're referring to someone as a [Romanichal gypsy]." Merritt contends that the trial

18

court's rulings limiting the cross-examinations of Mercer and Jeffrey on this topic amounted to an abuse of discretion. We disagree.

Even if we were to assume that Merritt was trying to establish Mercer's and Jeffrey's personal biases under Rule 622, defense counsel did not lay a proper foundation to do so. "Before a witness may be impeached for bias or hostility toward a party, the proper foundation must be laid by cross-examining the witness regarding his ill-feelings toward that party." (Citations omitted.) *Simmons v. State*, 266 Ga. 223, 226-227 (4) (466 SE2d 205) (1996). See also *Farley v. State*, 225 Ga. App. 687, 694 (484 SE2d 711) (1997) ("Unless there is evidence produced outside the hearing of the jury from a witness examined under oath with regard to feelings concerning the accused and any occurrence giving rise to such feelings, to create a factual basis that racial bias or prejudice exists and, in fact, influenced the witness' testimony or could be reasonably inferred to do so, such issue of racial bias or prejudice should not be injected into the proceedings, as such issue could tend to destroy the impartiality of the jury and because it would not be relevant.").

19

Here, defense counsel did not question Mercer about potential cultural biases she held against Merritt, Jeffrey denied the existence of such bias during her proffered testimony, and defense counsel proffered no other evidence on the point. Based on the foregoing, we conclude that the trial court did not abuse its discretion under Rule 622 by excluding this evidence.

4. Merritt contends that the trial court erred by granting the State's motion in limine to exclude the testimony of one of the defense's expert witnesses. The record shows that the trial court specially set Merritt's jury trial to begin on June 16, 2014. One week before trial, Merritt filed a motion to continue the case because his expert in forensic and clinical psychology was unavailable. Specifically, the defense planned to call this expert to testify about Merritt's prior diagnosis of post-traumatic stress disorder ("PTSD") and how it affected his interactions with law enforcement officers during his custodial interview. After holding a hearing on the motion at which the parties presented arguments, the trial court granted a continuance and re-set Merritt's trial to begin on July 28,

2014.

Thereafter, the State moved in limine to exclude the defense expert's testimony, arguing that it was immaterial and inadmissible. The record contains no written or oral ruling on the State's motion. However, in later motions contained in the record, defense counsel referenced a July 10, 2014 hearing in which the trial court allegedly granted the State's motion in limine.[2] There is nothing in the record indicating that Merritt ever objected to the State's motion in limine or took exception to the trial court's alleged pre-trial ruling. Consequently, this claim can be reviewed only for plain error.

As this Court has previously explained:

We may remedy an error under plain error review if (1)

---

[2] Specifically, in a motion filed on July 14, 2014, defense counsel asserted that, at the July 10, 2014 hearing, the trial court

> granted the motion and ordered that Defendant will be prohibited from offering expert testimony as to his diagnosis of PTSD and its effects on his conduct, intent, demeanor, communication and mental state. The basis for the Court's ruling was that Defendant has not filed a notice of intent to raise a defense of insanity, the Defendant's mental state, including his diagnosis of PTSD, is not at issue and is not relevant to the case.

However, there is no transcript of the July 10, 2014 hearing in the record before this Court.

the error was not affirmatively waived by the appellant; (2) the error is "clear or obvious, rather than subject to reasonable dispute"; (3) the error "affected the appellant's substantial rights"; and (4) "the error seriously affects the fairness, integrity or public reputation of judicial proceedings."

(Citation omitted.) *Williams v. State*, 302 Ga. 147, 151-152 (2) (805 SE2d 873) (2017). Assuming without deciding that Merritt did not affirmatively waive this claim and that the trial court committed a clear legal error by excluding the expert's testimony, Merritt still cannot obtain reversal on this basis because he cannot show that the error affected his substantial rights – i.e., that there is a reasonable probability that the outcome of trial would have been different had this evidence been admitted. See *Martin v. State*, 298 Ga. 259, 278 (6) (c) (779 SE2d 342) (2015), disapproved of in part on other grounds by *Willis v. State*, 304 Ga. 686, 706 n.3 (820 SE2d 640) (2018) (explaining that the test for harm under plain error review "requires a showing of a reasonable probability that the result of the proceeding would have been different, which is a probability sufficient to undermine confidence in the outcome" (citation and

punctuation omitted.)).  Here, the only evidence presented at trial regarding Merritt's behavior during his custodial interview concerned whether he appeared to understand his *Miranda*[3] rights and his subsequent waiver of the same.  And, while the prosecutor made statements during closing argument regarding Merritt's apparent lack of remorse during his interview with the police, these arguments were made in direct response to defense counsel's closing argument that Merritt was remorseful for shooting Rita.

Based on the foregoing, Merritt has failed to show that the trial court committed plain error because he cannot demonstrate that the outcome of his trial probably would have been different had his expert witness been allowed to testify at trial.

5.    Prior to trial, the State filed a notice of intent to present testimony pursuant to the residual hearsay exception, see OCGA § 24-8-807,[4] through lay witnesses Andrea Lyle, Mercer, and Jeffrey

---

[3] *Miranda v. Arizona*, 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966).
[4] OCGA § 24-8-807 states in pertinent part:
A statement not specifically covered by any law but having equivalent circumstantial guarantees of trustworthiness shall not

concerning Rita's descriptions of verbal and physical abuse that occurred in her marriage prior to her death. At trial, Lyle testified that she knew Rita through work, that they would socialize outside of work, and that Rita was her "best friend." She further testified that she and Rita would confide in each other about things going on in their lives, including things going on in Rita's marriage to Merritt. Specifically, Lyle testified that Rita reported being physically and mentally abused by Merritt, showed Lyle bruising from the beatings, and stated that Merritt would kill her if she ever tried to leave. Mercer, Rita's sister, testified that she and Rita were very close and they were like best friends. They worked together, saw each other every day, and discussed intimate and personal matters with each other. Regarding her marriage, Rita told Mercer that Merritt had "threatened to kill her if she ever left him." Finally,

---

be excluded by the hearsay rule, if the court determines that: (1) The statement is offered as evidence of a material fact; (2) The statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (3) The general purposes of the rules of evidence and the interests of justice will best be served by admission of the statement into evidence. . . .

Jeffrey, Rita's sister-in-law, testified that she had a good relationship with Rita, that they spoke on a regular basis, and that Rita shared personal information with her, including information about Rita's marriage. Jeffrey testified that Rita would call her crying because Merritt called her a "sorry mother" and a "b**ch," that Rita expressed concerns about Merritt's potential infidelity, that Rita told Jeffrey that Merritt had kicked her down the stairs while she was pregnant with their youngest child, and that Rita told Jeffrey she could not leave Merritt because he would kill her.[5]

Merritt did not object to the admission of this testimony at trial. Now, on appeal, he claims that the trial court committed plain error by admitting the hearsay testimony of Lyle, Mercer, and Jeffrey pursuant to OCGA § 24-8-807. Specifically, Merritt argues that these hearsay statements did not have sufficient guarantees of trustworthiness. Merritt, however, has failed to show that the trial court committed clear or obvious error by admitting Rita's

[5] In addition to this testimony, all three witnesses testified about numerous acts of physical violence and verbal abuse that Merritt had committed against Rita that these women had directly witnessed.

25

statements through these witnesses. See *Williams*, supra, 302 Ga. at 151-152.

OCGA § 24-8-807 applies "only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." (Citation and punctuation omitted.) *Smart v. State*, 299 Ga. 414, 421 (3) (788 SE2d 442) (2016). These guarantees of trustworthiness "must be equivalent to cross-examined former testimony, statements under a belief of impending death, statements against interest, and statements of personal or family history." (Citation and punctuation omitted.) Id. This is so because "[s]uch categories of hearsay have attributes of trustworthiness over and above that possessed by the general run of hearsay statements, and the hearsay is considered sufficiently trustworthy because of the circumstances under which the hearsay statements were originally made." *Tanner v. State*, 301 Ga. 852, 856 (1) (804 SE2d 377) (2017). However, this Court has previously held that a victim's description of prior acts of domestic violence against her to her family and friends carries an increased level of

26

trustworthiness.  See *Jacobs v. State*, 303 Ga. 245, 251 (2) (811 SE2d 372) (2018) (no abuse of discretion where the trial court "determin[ed] that the statements from [the victim] to her friends . . . describing the nature of her abusive relationship with [the defendant] prior to her death had the requisite 'exceptional guarantees of trustworthiness' to be admissible at trial pursuant to Rule 807"); *Smart*, supra, 299 Ga. at 422 (3) (trial court's admission of statements from murder victim to her friends and family describing acts of domestic violence committed by defendant was neither clear nor obvious error as the hearsay statements had sufficient guarantees of trustworthiness).

Here, Rita consistently described acts of domestic abuse to her close friend and family members, and these same people directly witnessed acts of domestic violence against Rita.  Accordingly, we cannot say that the trial court committed clear or obvious error by determining that the statements had sufficient guarantees of trustworthiness and admitting these hearsay statements at trial through Lyle, Mercer, and Jeffrey.

27

6.    Merritt contends that the trial court erred by admitting at trial evidence relating to his 2008 simple battery conviction pursuant to Rule 404 (b) (evidence of other acts may be admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident").  During the State's case-in-chief, the prosecutor asked Mercer to describe an incident that occurred at the hospital after Rita had given birth to one of her and Merritt's children.  Mercer testified that, while visiting the new baby, Rita's mother remarked that Merritt was being too rough with another of the couple's children.  Merritt then struck his mother-in-law, which led to a physical fight between Merritt, Rita's mother, and Mercer.  Rita, who was recovering from giving birth, pleaded for Merritt to stop.  Mercer testified that, as the fight broke up, Merritt shouted that he would kill them all.  The State then tendered its Exhibit 36, a certified copy of Merritt's 2008 misdemeanor conviction for simple battery stemming from this fight.[6]  Thereafter, the trial

---

[6] The documents admitted at trial show that Merritt was accused of two counts of simple battery, Count 1 for "grabbing, pushing and choking" Felicia

28

court instructed the jury as follows:

> Ladies and gentlemen, sometimes evidence is tendered for a limited purpose and that's the case with regard to Exhibit Number 36. In this case, the State has offered evidence in the form of Exhibit 36, which is a certified copy of the defendant's conviction for simple [battery] in Carroll County.
>
> It is tendered for the limited purpose of proving the defendant's intent and against a claim or affirmative defense of accident about which I will charge you more fully at the conclusion of this case. And again, it is not to be considered for any other purpose other than the limited purpose for which it has been tendered, which is proving the defendant's intent, if you so decide, and against any claim of accident, if you so decide.
>
> But that's all it's offered for and you can — it has nothing to do with the issue of guilt or innocence of his conviction of this case, okay?

Merritt now contends that the trial court erred by admitting this evidence for the purpose of showing intent. Because this evidence was admitted at trial without objection, we can review this claim only for plain error. See *Williams*, supra, 302 Ga. at 151-152. Assuming without deciding that the trial court committed a clear

---

Mercer, and Count 2 for "grabbing and pushing" Rita's mother. Merritt pled guilty to Count 1, and the trial court nolle prossed Count 2.

legal error by admitting this evidence for the purpose of showing intent under Rule 404 (b), Merritt cannot obtain reversal on this basis because he cannot show that the error affected his substantial rights. See *Martin*, supra, 298 Ga. at 278 (6) (c).

Here, in addition to the significant physical and forensic evidence establishing Merritt's guilt, the State presented the statements of the three-year-old witness to the shooting and testimony from other witnesses describing numerous instances of Merritt's prior acts of domestic violence against Rita, all of which contradicted his accident defense. Based on the foregoing, Merritt has failed to show that the trial court committed plain error, because he cannot demonstrate that the outcome of his trial would have been different absent the introduction of evidence regarding the prior simple battery.

7. Merritt argues that the trial court erred by failing to instruct the jury on self-defense and defense of others. "To authorize a requested jury instruction, there need only be slight evidence to support the theory of the charge, and the necessary evidence may be

presented by the State, the defendant, or both." (Citation and punctuation omitted.) *Collins v. State*, 308 Ga. 515, 519 (2) (842 SE2d 275) (2020). "Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." (Citation and punctuation omitted.) *McClure v. State*, 306 Ga. 856, 863 (1) (834 SE2d 96) (2019).

> Merritt's requested charge read as follows:
>
> A person is justified in threatening or using force against another person when, and to the extent that, he reasonably believes that such threat or force is necessary to defend himself or a third person against the other's imminent use of unlawful force. A person is justified in using force that is intended or likely to cause death or great bodily harm only if that person reasonably believes that such force is necessary to prevent death or great bodily injury to himself or a third person or to prevent the commission of a forcible felony. The State has the burden of proving beyond a reasonable doubt that the defendant was not justified.

Ga. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases § 3.10.10 (4th ed. 2007) (Justification; Use of Force in Defense of Self or Others).[7] In support of the charge, defense counsel argued that

---

[7] Merritt also requested the trial court give additional pattern charges

31

during Merritt's custodial interview, officers "asked him if he thought that Rita was going for the gun to shoot him with it and his answer was, no, I don't think so, but maybe she was. I hope she was, or something like that. It would make me feel better to think that she was." Counsel argued that Merritt's statement of "maybe she was" going to shoot him, in combination with Merritt's explanation that he took the gun in order to protect Rita from herself, was sufficient to support a charge on justification. The trial court refused to give the requested charge, explaining, "I don't recall any line of testimony in this case, including his recorded statement, where he ever indicated he was afraid of Rita. He always said, I wasn't afraid of her, you know, I just didn't want her to hurt herself." Counsel objected to the trial court's ruling.

We conclude that the trial court did not err by refusing to give

---

concerning self-defense. See Ga. Suggested Pattern Jury Instructions, Vol. II: Criminal Cases §§ 3.01.10 (Justification; Generally), 3.10.12 (Reasonable Beliefs; Doctrine of), and 3.16.10 (Justification; Threats, Menaces Causing Reasonable Belief of Danger). The trial court refused to give any instruction on justification, ruling that the evidence did not support the requested jury charges.

the requested charge because there was not slight evidence in this case to support a charge on justification. "A person is justified in threatening or using force against another when and to the extent that he or she reasonably believes that such threat or force is necessary to defend himself or herself or a third person against such other's imminent use of unlawful force. . . ." OCGA § 16-3-21 (a). Merritt has pointed to no evidence that shooting Rita was necessary to defend himself or any third person from any imminent use of unlawful force. Indeed, Merritt told officers that he did not believe Rita was trying to shoot him but, instead, believed she was attempting to harm herself. And, even assuming that Merritt picked up the gun with the purpose of saving Rita from herself (as Merritt suggested to officers) it is illogical that this was also the reason he used deadly force. Finally, the evidence presented at trial established that Rita was sitting down and looking away from the gun when she was shot in the back of the head. "Because no construction of the evidence would support a finding that [Merritt] shot in self-defense, the trial court properly refused to charge on that

33

issue." (Citation omitted.) *Broussard v. State*, 276 Ga. 216, 217 (2) (576 SE2d 883) (2003).[8]

*Judgment affirmed. All the Justices concur.*

Decided June 21, 2021.

Murder. Polk Superior Court. Before Judge Murphy.

*James K. Luttrell*, for appellant.

*Oliver J. Browning, Jr., District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Michael A. Oldham, Assistant Attorney General*, for appellee.

---

[8] Merritt does not argue that all the errors we assume today, though individually harmless, nevertheless harmed him when aggregated. And no such cumulative prejudice is apparent to us on this record. See *State v. Lane*, 308 Ga. 10, 18 (1) (838 SE2d 808) (2020) ("[A] defendant who wishes to take advantage of the [cumulative error rule] should explain to the reviewing court just how he was prejudiced by the cumulative effect of multiple errors."); *Armstrong v. State*, 310 Ga. 598, 607 (5) n.13 (852 SE2d 824) (2020).