**FOURTH DIVISION**
**DILLARD, P. J.,**
**BROWN and PADGETT, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

**May 10, 2024**

# In the Court of Appeals of Georgia

A24A0115. WALMART STORES EAST, LP v. LEVERETTE.

BROWN, Judge.

Bettie Leverette sued Walmart Stores East, LP ("Walmart"), seeking damages for future medical expenses and past and present pain and suffering, after two Walmart employees moving a heavy load with a pallet jack ran into Leverette. The jury returned a verdict in favor of Leverette, awarding her $1,000,000 in nominal damages. The trial court entered judgment on the verdict, and Walmart filed a motion for new trial, which the trial court denied. Walmart appeals, contending that the nominal damages awarded were excessive as a matter of law and that Leverette's allegedly improper cross-examination of Walmart's expert tainted the jury's verdict. For the reasons explained below, we affirm.

*The Incident*

Viewed in the light most favorable to the jury's verdict, see *Fassnacht v. Moler*, 358 Ga. App. 463 (855 SE2d 692) (2021), the evidence presented at trial showed that Leverette was shopping with her adult granddaughter and great-grandchildren at a Walmart in Covington on April 25, 2018. Leverette, who was 72 years old and suffered from a myriad of health issues, including chronic obstructive pulmonary disease (COPD), congestive heart failure, chronic kidney disease, emphysema, hypertension, and arthritis, was sitting in a motorized shopping cart. Two Walmart employees were using a manual pallet jack to move a 2,000-pound load down an aisle, with one employee pushing and the other pulling backward. It is undisputed that they ran into Leverette. The Walmart employee walking backward and pulling the pallet jack described the incident as follows:

> I bumped into Ms. Leverette and I pushed back against the scorpion box to stop it from moving any further. Then I asked her if she was all right, if I had harmed her in any way. She told me she was fine, and I believe that's all. I just continued on with pulling the scorpion box after she had moved out of the aisle.

When asked to describe the impact, the employee stated, "[v]ery light, not harsh at all," and said his shoulder made contact with Leverette. The employee testified that as he was walking backward, he looked frequently over his shoulder to check the path, but he had not seen Leverette.

Leverette's granddaughter was bending over and did not see the moment contact occurred. She asked Leverette if she was okay, and Leverette replied that she thought so but seemed "a little confused." Before leaving the store, Leverette and her granddaughter filled out an incident report, in which Leverette stated that she had been "hit . . . full force in the back of [the] head and shoulder." When asked by Walmart personnel whether she needed paramedics, Leverette declined. Later that evening, Leverette went to the emergency room for head pain and blurred vision. According to the treating physician at the emergency room, a head CT scan showed no sign of injury and he found no signs of a concussion. Leverette was discharged with a diagnosis of "non-specific head injury."

*Leverette's Medical History Following the Incident*

Immediately following the incident, Leverette reported to her primary care provider, who referred her to a neurologist. One month after the incident, Leverette

again presented to her primary care provider, complaining of a weeks-long, severe headache with blurred vision and that she "cries for no reason." From June to July of 2018, Leverette was in the hospital for renal failure, receiving dialysis. Leverette first saw a neurologist, Dr. Angela Ashley, on July 11, 2018, and was diagnosed with post-concussion syndrome. Shortly after, Leverette again was admitted to the hospital for cardiac complications. By December 2018, Leverette was reporting dizziness, loss of balance, lightheadedness, blurred vision, and difficulty walking with an ongoing headache in the back of the head. Leverette took Gabapentin and received injections to alleviate the headache pain, and wore Scopolamine transdermal patches to help with the dizziness. Leverette was hospitalized for five days in December 2018, for COPD and pneumonia. In January 2019, Leverette reported to her primary care provider that the headaches had become more frequent and more severe and that she had fallen twice in the last year, did not sleep much, and felt depressed. In August 2019, Leverette reported that medication was not helping her headaches, and that she was continuing to experience sleep disturbance, vertigo, severe back pain, and "mood disturbance." Leverette was hospitalized in November 2019, for acute COPD exacerbation and in January 2020, for pneumonia. In July 2020, Leverette reported

to her primary care provider that her headache "pain level is 9/10" and that she was experiencing nausea with the headaches. A few months before the trial took place in 2022, Leverette was admitted to the hospital for emphysema.

During her trial testimony, Leverette admitted that she had complained of headaches and neck pain prior to the incident at Walmart. Leverette's daughter, a nurse, testified that after the Walmart incident, Leverette has had more severe headaches, gets dizzy quickly and has trouble walking, constantly complains of pain in her head and neck, and suffers from nausea. According to Leverette's daughter, Leverette's personality is not the same, she cries a lot, and seems depressed.

Leverette's treating neurologist, Dr. Ashley, testified that her overall assessment is that Leverette sustained a concussion as a result of the injury at Walmart and developed post-concussion syndrome, meaning she is "in the very small percentage of patients who reach past the one[-]year mark and haven't had complete recovery of their symptoms." She further clarified that "post-concussion syndrome is a very specific diagnosis that means you had a concussion, your symptoms have been present for a prolonged period of time, and you continue to have things like headaches, dizziness, fatigue, problems with your mood, problems with your memory,

difficulty tolerating stress, alcohol, or emotion[.]" When asked about Leverette's preexisting medical conditions, Dr. Ashley testified,

> it was a slippery slope; and as a result of that [Walmart] injury and the medicines that she was given to treat the injury, she experienced a progressive decline that it would be very difficult to disentangle from that inciting event. . . . [S]he did have a decline in her overall health including complications of the problems that she already had.

As far as Leverette's prognosis, Dr. Ashley testified as follows:

> The fact that she has not made significant improvement in the entire . . . two years that I've been taking care of her, I do not believe that it is likely that she will get complete resolution of her headaches. I think it's possible that she could get some improvement in her balance. . . . And the prognosis for significant cognitive recovery after two years is minimal. . . . [H]er current level of functioning is what we can expect from her here on out.

Dr. Sean Mahan, Leverette's treating radiologist who reviewed MRIs of her brain from July 2018 and April 2019, testified that Leverette had "white spots in the brain [that] should not be there," which "represent[ ] areas of brain injury." He explained that "these are what they call nonspecific, meaning they could be caused by many things . . . [including] traumatic brain injury," but that "this person needs to be

evaluated by a clinical doctor [to] determine if the patient actually has [a] traumatic brain injury." Dr. Mahan testified that the white matter lesions "are in the location that is commonly associated with traumatic brain injury," and that based on the location of the lesions, "this patient may be manifesting symptoms that are being identified by other people as memory loss." According to Dr. Mahan, "for [Leverette's] age, the rest of her brain, except for these white matter lesions, is extremely healthy . . . [and] otherwise normal." Dr. Mahan explained as a person ages, the "brain is . . . more susceptible to injury and it's harder to heal from those injuries." With regard to Leverette's cervical MRI, Dr. Mahan noted an "acute," as opposed to chronic, herniated disk pressing on Leverette's spinal cord, indicating that the herniated disk had "occurred sometime recently" when the MRI was done. However, there was evidence of "degenerative change throughout her cervical spine . . . because that's the normal aging process."

*The Lawsuit and Trial*

In August 2018, Leverette filed suit against Walmart,[1] alleging claims of negligence and battery, seeking punitive damages, damages for past and present pain

---

[1] Leverette named other defendants in her complaint but subsequently dismissed them.

and suffering, medical expenses, and lost wages. Leverette later amended her complaint to allege negligence, negligent training and supervision, and punitive damages. Prior to trial, the trial court granted summary judgment in favor of Walmart on Leverette's claim for punitive damages.

During the trial, Leverette also introduced the testimony of a life care planner, Sarah Lustig, admitted as an expert in nursing, rehabilitation care, and life care planning. Lustig testified that she formulates a plan that includes the charges for all of the care over the life expectancy of an individual for a particular injury. Lustig testified that she consulted with Leverette's treating neurologist and collectively concluded that Leverette has "cognitive impairment and a need for 24/7 supervision." The plan formulated by the planner is only in relation to the incident and thus "there[ is] nothing in the plan about cardiology, neph[rology], or pulmonology needs." The life care plan totaled from $2,242,896 on the lower end to $3,492,716 on the higher end, considering Leverette's medication, therapy, medical equipment, and 24-hour attendant care, relating only to "her cognitive impairment," for the estimated remainder of Leverette's life. The planner testified that if the plan

had taken into account Leverette's "other medical conditions . . . it would be a lot more expensive."

Walmart presented the testimony of three retained experts: (1) Dr. Matthews Gwynn, a neurologist, (2) Dr. Thomas Burns, a neuropsychologist, and (3) Audrey Cowart, a life care planner.

Dr. Gwynn performed an independent medical evaluation of Leverette in November 2019, and reviewed Leverette's medical records, including her April 2019 MRI, as well as video of the incident at Walmart.[2] Based on the video, he concluded "there was very little, if any, trauma to her head from what I could tell." With regard to Leverette's MRI, Dr. Gwynn testified that Leverette's brain looked "quite good" for her age with the only "abnormal" finding being "these white areas, that's just signs of little bits of injury over the years from . . . not getting enough blood to that area[.]" He referred to it as "periventricular white matter disease" and "normal wear and tear." He saw no evidence of any traumatic brain injury and concluded that Leverette had not sustained a concussion as a result of the Walmart incident. In reviewing Leverette's cervical MRI, Dr. Gwynn saw "arthritis of the neck" but

_____

[2] Videos of the incident also were played for the jury during the trial.

"nothing . . . convincing . . . me that there was any kind of major herniated disk . . . that would cause . . . severe complaints." Dr. Gwynn also performed cognitive testing on Leverette in November 2019, but concluded that it was not a "valid" test because Leverette scored so poorly and Dr. Gwynn did not "think she was giving full effort" or was "[u]nderperforming." His overall impression was that Leverette was "embellishing her symptomology."

Dr. Burns, Walmart's neuropsychologist, examined Leverette and testified that the results of the neurological testing he performed were not reliable because of "effort." According to Dr. Burns, Leverette was unable to stay awake or pay attention so he was unable to reliably test and come to a conclusion regarding her cognitive impairment. Based on his review of Leverette's medical records, he saw "a progression of a neurophysiological decline that was . . . present over a long period," diagnosed Leverette with a cognitive disorder (not otherwise specified), and concluded that Leverette's neurological decline relates to the progression of her medical conditions that existed regardless of the Walmart incident. When asked by Walmart's counsel if he was saying that Leverette was "faking," Dr. Burns answered that was not what he meant by "malingering," but rather that "she's ascribed most

10

of her symptoms to what happened at Walmart when these symptoms . . . were there all along and have progressed."

Walmart's life care planner concluded that the life care plan prepared by Lustig was "unreasonable and unnecessary," and that Lustig's conclusion that Leverette needed 24-hour care, particularly related to a head injury, was unsupported by the medical records. She also questioned the failure of Leverette's expert to review Leverette's medical records from prior to the incident.

In closing, counsel for Leverette requested that the jury award her $3,679,200 for future pain and suffering and $1,916,968 for future medical care for a total sum of $5,596,168 in damages. In its closing, Walmart argued:

> The law provides another remedy that you might consider, which is worth considering also. If you believe that [the Walmart employee] shouldn't have backed into [Leverette] and if you believe that he wasn't careful and if you believe that the injury was slight and not severe trauma, you know, with great force sufficient to cause a concussion, that it was just a bump, if nothing else it was an insult, then the law provides for what's called nominal damages. . . . It can be $10, it can be $100, it could be $500, but it should not be [$]3 million. They haven't proven anything beyond nominal damages. . . . Nominal damages is the only thing they would be entitled to, if even that.

The trial court charged the jury on nominal damages as follows:

> Damages are given as pay or compensation for injury done. When one party is required to pay damages to another, the law seeks to ensure that the damages awar[d]ed are fair to both parties. If you believe from a preponderance of the evidence that the plaintiff is entitled to recover, then you should award to plaintiff such sums as you believe are reasonable and just in this case. If the injury is small or mitigating circumstances are strong, only nominal damages are given. What would be the proper amount of nominal damages is a question for you to decide under all the facts and circumstances of the case.

Walmart requested that the verdict form include an option to award nominal damages. The trial court granted Walmart's request over Leverette's objection. The jury returned a verdict in favor of Leverette, awarding $1,000,000 in nominal damages. The jury did not award Leverette any damages for future medical expenses or past and present pain and suffering.

After the trial court entered judgment on the verdict, Walmart filed a motion for new trial. Walmart asserted that the "jury's award of only nominal damages to the total exclusion of special or general damages was authorized by the evidence and instruction of the [c]ourt, but the amount of nominal damages of $1,000,000 was excessive as a matter of law and not a legal award of nominal damages." In its

12

amended motion, Walmart contended that the verdict was contrary to law and to the evidence and strongly against the weight of the evidence, and that the nominal damages award was legally excessive and resulted from bias, prejudice, or mistake. Walmart identified three "[o]ther errors during the trial [which] further induced prejudice, bias, or mistake on the part of the jury resulting in a legally excessive . . . award": the admission of the opinions and life care plan offered by Lustig; the trial court's exclusion of evidence concerning the business relationship of Dr. Ashley with Leverette's counsel and a settlement advance company; and Leverette's improper examination of Walmart's expert, Dr. Gwynn.

While the trial court's order addressed two of the three errors asserted by Walmart as evidence of bias, prejudice, or mistake on the part of the jury, the court's order did not specifically address Walmart's argument regarding the cross-examination of Dr. Gwynn. Its order states, "In this case, the [c]ourt finds that the record does not justify the inference that the verdict of the jury was the result of prejudice, bias, or gross mistake." The order goes on to state:

> The verdict in this case was not contrary to the evidence or to the principles of justice and equity. The verdict in this case was not against the weight of evidence. No basis exists to warrant a new trial, on the

13

grounds of excessive verdict, or on any of the "other special grounds" recognized by Georgia common law.

1. Walmart contends that the jury's award of $1,000,000 in nominal damages is excessive as a matter of law and should be set aside. We disagree.

"The question of damages is ordinarily one for the jury; and the court should not interfere with the jury's verdict unless the damages awarded by the jury are clearly so inadequate or so excessive as to be inconsistent with the preponderance of the evidence in the case." OCGA § 51-12-12 (a).

> The focus of OCGA § 51-12-12, under which the award is being reviewed, is to allow the trial court to interfere with a jury verdict in two opposite situations — where the award is so inadequate or so excessive as to be contrary to the preponderance of the evidence. An excessive or inadequate verdict is a mistake of fact rather than of law and addresses itself to the discretion of the trial judge who, like the jury, saw the witnesses and heard the testimony.

(Citations, punctuation and emphasis omitted.) *Kohl v. Tirado*, 256 Ga. App. 681, 682 (1) (569 SE2d 576) (2002). See also *Rockdale Hosp. v. Evans*, 306 Ga. 847, 851 (2) (a) (834 SE2d 77) (2019) ("[b]y its plain text, OCGA § 51-12-12 pertains only to the discretion of the trial court . . . to review an award and to determine whether the

damages awarded were within the range authorized by a preponderance of the evidence"). "In reviewing a trial court's denial of a motion for new trial based on an excessive damages argument, we determine only whether the trial court abused its discretion." *Cavin v. Powell*, 276 Ga. App. 60, 61 (1) (622 SE2d 415) (2005). See also *Rockdale*, 306 Ga. at 851-852 (2) (b) ("While trial courts have discretionary powers to set aside verdicts based on an analysis of the evidence they observed as described in OCGA § 51-12-12, appellate review is confined to the question of whether the trial court abused its discretion in deciding the motion for new trial on this ground."). "The general rule on appeal of an award of damages is that a jury's award cannot be successfully attacked so as to warrant a new trial unless it is so flagrantly excessive or inadequate, in light of the evidence, as to create a clear implication of bias, prejudice, or gross mistake on the part of the jurors." (Citation and punctuation omitted.) *Booker v. Older Americans Council of Middle Ga.*, 278 Ga. App. 407, 411 (4) (629 SE2d 69) (2006). See *Rockdale*, 306 Ga. at 852 (2) (b) ("a verdict that is so excessive or inadequate as to be irrational and thus the apparent result of jury bias, prejudice, or corruption has long been considered subject to appellate correction"). Thus, even if the evidence presented at trial would authorize a greater or lesser award than that

actually made, we will not disturb the award "unless it is so flagrant as to shock the conscience. Moreover, the trial court's approval of the verdict creates a presumption of correctness that will not be disturbed absent compelling evidence."*Booker*, 278 Ga. App. at 411 (4).

"Nominal damages are a form of 'general damages,' a term which refers to those which the law presumes to flow from a tortious act." (Citation, punctuation and emphasis omitted.) *Cotto Law Group v. Benevidez*, 362 Ga. App. 850, 856 (1) (b) (iv) (870 SE2d 472) (2022). See also OCGA § 51-12-4 ("Damages are given as compensation for injury. . . . If an injury is small or the mitigating circumstances are strong, nominal damages only are given.").

> [C]ase law makes clear nominal damages are awarded: (1) where no actual damage flows from the injury; or (2) where the violation of a right is shown, substantial damages claimed, and some actual loss proved, and yet the damages are not susceptible of reasonable certainty of proof as to their extent.

(Citation and punctuation omitted.) *King v. Brock*, 282 Ga. 56, 57 (646 SE2d 206) (2007).

> [I]n Georgia, the term "nominal damages" is purely relative, and carries with it no suggestion of certainty as to amount. Instead of being

restricted to a very small amount, the sum awarded as nominal damages may, according to circumstances, vary almost indefinitely.

(Citations and punctuation omitted.) *First Fed. Sav. & Loan Assn. of Atlanta v. White*, 168 Ga. App. 516 (3) (309 SE2d 858) (1983). See also *Brock v. King*, 279 Ga. App. 335, 344 (629 SE2d 829) (2006) ("'nominal' does not necessarily mean 'small'"). According to our Supreme Court, "[i]n some cases, a very small amount might constitute the trivial sum contemplated by the term 'nominal damages'; in others, a much larger amount might measure down to the same standard of triviality. It would depend largely upon the vastness of the amount involved what sum would be considered trivial." *Sellers v. Mann*, 113 Ga. 643, 644 (39 SE 11) (1901). "Where nominal damages are authorized, the proper amount of the award is the prerogative of the trier of fact, whose determination is not to be disturbed on appeal, except in extreme cases." (Citations and punctuation omitted.) *Benevidez*, 362 Ga. App. at 857 (1) (b) (iv). It is well established that "even though a verdict for nominal damages may be apparently large in its amount, it cannot be set aside simply because the amount is large, absent evidence of prejudice or bias in any incident at trial or a mistake on the part of the jury." *Wright v. Wilcox*, 262 Ga. App. 659, 663 (2) (586 SE2d 364) (2003)

(an award of $22,000 in nominal damages not excessive as a matter of law). See also

*MTW Inv. Co. v. Alcovy Properties*, 273 Ga. App. 830, 832 (1) (616 SE2d 166) (2005)

(refusing to set aside jury's award of $625,000 in nominal damages where appellant

argued solely that the "excessive amount" justified this Court's intervention);

*Atlantic Coast Line R. Co. v. Stephens*, 14 Ga. App. 173 (80 SE 516) (1914); *Western*

*Union Tel. Co. v. Glenn*, 8 Ga. App. 168 (68 SE 881) (1910). See also *SIS, LLC v.*

*Stoneridge Software*, No. 21-13567, 2023 WL 164067, at *8 (III) (B)-(C) (11th Cir.

2023) (rejecting appellant's argument that $85,000 award of nominal damages failed

to meet the "'standard of triviality required by Georgia law'").

Given the conflicting expert testimony in this case as well as the evidence

regarding the interplay of Leverette's many preexisting conditions and her symptoms

following the incident, the jury could have concluded that Leverette had proved

"some actual loss" but that "the damages are not susceptible of reasonable certainty

of proof as to their extent."[3] *White*, 168 Ga. App. at 516 (3) ("a recovery may be

---

[3] Walmart asserts that Leverette "never sought nominal damages on that theory, and the trial court never instructed the jury on it." According to Walmart, the trial court's instructions on nominal damages only permitted a nominal damages award if the jury determined that the injury was small or mitigating circumstances were strong. The trial court gave the pattern jury charge on nominal damages, which tracks the language of OCGA § 51-12-4. See Georgia Suggested Pattern Jury

classified as coming under the definition of nominal damages where the violation of a right is shown, substantial damages claimed, and some actual loss proved, and yet the damages are not susceptible of reasonable certainty of proof as to their extent") (citation and punctuation omitted). See also *Miller & Meier & Assocs. v. Diedrich*, 174 Ga. App. 249, 254 (3) (329 SE2d 918) (1985) ("A plaintiff may recover nominal damages not only where his actual damages are minute, but also where he has not proved his actual damages by a preponderance of the evidence to the satisfaction of the jury."), reversed in part on other grounds, *Diedrich v. Miller & Meier & Assocs., Architects & Planners*, 254 Ga. 734 (334 SE2d 308) (1985); *Duckworth v. Collier*, 164 Ga. App. 139, 140-141 (3) (296 SE2d 640) (1982) (affirming nominal damages award where the violation of a right is shown, substantial damages claimed, some actual loss proved, and "yet the damages are not susceptible of reasonable certainty of proof as to their extent"). As to the amount, Leverette sought $5,596,168 in damages and the jury awarded her $1,000,000 — less than one-fifth of the amount requested. See

---

Instructions - Civil, 66.010 Tort Damages; Generally; Nominal Damages. See also *Bond v. Davis*, 194 Ga. App. 379, 380 (2) (390 SE2d 627) (1990). We have found nothing in our law requiring a party to elect a theory of nominal damages under which to proceed or to procure an additional jury charge separate from the pattern charge on nominal damages.

*Miller*, 174 Ga. App. at 254 (3), n.6. ("Georgia applies a test of relativity rather than limiting [nominal damages] to a trivial sum."). "The [c]ourt below, did not think the damages excessive. And the [c]ourt trying the case, must ever receive more light on the question of excessive damages, than it can impart to any other [c]ourt. Considering all of the circumstances in this case, we do not find the trial court erred in declining to find the verdict excessive." (Citation and punctuation omitted.) *Smith*, 247 Ga. at 372 (3).

Walmart contends that this Court's decision in *Fowler's Holdings v. CLP Family Investments*, 318 Ga. App. 73, 74 (1) (a) (732 SE2d 777) (2012), establishes that the size alone of a "large verdict" can establish excessiveness without any showing of bias, prejudice, or mistake, and controls in the instant case. In *Fowler's*, we concluded that "[a]n award of nominal damages in the amount of $120,000 in a case in which actual damages amounted at most to five times that amount is neither absolutely nor relatively trivial," and that "an award of nominal damages amounting to approximately one-fifth of an amount of total damages claimed, the latter not itself trivial, cannot meet the 'standard of triviality' set out in longstanding Georgia law." Id. at 74-75 (1) (a).

As already stated, "nominal damages" are "purely relative," and depend on the circumstances of the case, and *Fowler's* presented a different set of circumstances. First, it was a breach of contract case, not a personal injury tort suit. Cf. *Western Union Telegraph Co.*, 8 Ga. App. at 169 (noting "there is a wide difference between the mere breach of a contract and a tort" in the context of excessiveness of a nominal damages award). See also OCGA § 13-6-6 ("In every case of breach of contract the injured party has a right to damages, but if there has been no actual damage, the injured party may recover nominal damages sufficient to cover the costs of bringing the action."). But see *Travelers Property Cas. Co. of America v. SRM Group*, 348 Ga. App. 136, 140-141 (1) (b) (820 SE2d 261) (2018) (refusing to set aside award of $57,858 in nominal damages for breach of contract "simply because the amount is large"), reversed in part on other grounds, *SRM Group v. Travelers Property Cas. Co.*, 308 Ga. 404 (841 SE2d 729) (2020). More importantly, *Fowler's* was not reviewing a jury verdict, but rather an award of nominal damages following a bench trial. Thus, the nominal damages award in *Fowler's* did not enjoy the "presumption of correctness" created by a trial court's approval of a jury verdict pursuant to OCGA § 51-12-12 (a). *Booker*, 278 Ga. App. at 411 (4). See *Rockdale*, 306 Ga. at 852 (2) (b) ("the threshold for an

21

appellate court to set aside a jury verdict approved by the trial court under OCGA §

51-12-12 (a) is 'extremely high'") (citation omitted). Finally, this Court's holding in

*Fowler's* was based on the fact that "[a]lthough the trial court found that 'the damages

suffered by [the plaintiff] are not trivial but are substantial,' it awarded $120,000 as

nominal rather than actual damages." 318 Ga. App. at 73 (1) (a). For these reasons,

*Fowler's* does not control here.

2. While Walmart asserts that the unprecedented size of the award alone based

on *Fowler's* suffices to show that it resulted from jury bias, prejudice, or mistake, it

also contends that Leverette's "irrelevant, highly prejudicial cross-examination of

Walmart's expert added still further . . . force to the conclusion that . . . the nominal

damages award was induced by bias, prejudice, or mistake." Again, we disagree.

Walmart retained Dr. Gwynn to perform an independent medical examination

of Leverette. Leverette was permitted to play the following testimony from Dr.

Gwynn's deposition for the jury over Walmart's objection:

> [Leverette's Counsel:] Now I want to talk to you about your prior work
> with Walmart. We discussed this in your prior deposition, the 2006 case
> of [Jane Doe] versus Walmart?
> [Dr. Gwynn:] Right.

[Leverette's Counsel:] Yeah. And you recall me asking about this case in your last deposition; right?

[Dr. Gwynn:] I do. I reviewed that recently, last night.

[Leverette's Counsel:] Okay. So you still have that deposition transcript, don't you?

[Dr. Gwynn:] Yes.

[Leverette's Counsel:] Okay. Now, a lady was shot in the breast at Walmart, and Walmart hired you to examine her; right?

[Objection by Walmart's counsel.]

[Dr. Gwynn:] I believe that the attorneys who represented Walmart . . . asked me to review her — to do an [independent medical examination] on her, with her, just as I did with Ms. Leverette.

[Leverette's Counsel:] Right. Okay. And you concluded that the lady who was shot in her breast was exaggerating her symptoms; right?

[Dr. Gwynn:] I don't remember the — the final things about the case because I don't have the report, but — and I haven't reviewed it lately, ever since really that the case happened, and — but I think I did say that.

[Leverette's Counsel:] Okay. And during your medical exam of her, you went to touch her breast and she winced?

[Dr. Gwynn:] I think —

[Leverette's Counsel:] And based on that, you concluded that she was exaggerating her pain symptoms; right?

[Dr. Gwynn:] I don't — I don't remember the case precisely, but I don't think it was just that. I think there were other things, too. But as I said, I haven't reviewed that case in a long time.

[Leverette's Counsel:] Okay. If you were shot in a sensitive part of your body, do you think you might wince if someone tried to touch you there?
[Objection by Walmart's counsel.]
[Dr. Gwynn:] Well, it depends. If a — if a wound is well healed . . . and there's nothing wrong with it anymore, then maybe yes, maybe no.

Walmart objected on the basis that the testimony was irrelevant, prejudicial, and lacked a proper foundation. Walmart also argued that it could be viewed as suggesting sexual impropriety on the part of Dr. Gwynn. Leverette's counsel asserted that the purpose of the testimony was "to attack the bias and the methodology of this expert . . . by showing he's used these similar improper techniques . . . when being paid by Walmart." The trial court overruled the objection and admitted the evidence.

During opening statements, counsel for Leverette stated to the jury:

Walmart's experts, Dr. Burns and Dr. Gwynn, they are going to say Bettie isn't really hurt. But you're going to hear about Dr. Gwynn and how he's worked for Walmart in the past. You're going to hear about a case from 2006 where a lady was shot at a Walmart and Dr. Gwynn was hired to examine her. She was shot in the breast. And at this medical exam, Dr. Gwynn went to grab her breast and she winced. Based on that, he concluded she wasn't really hurt.

Walmart did not object. Leverette's counsel subsequently reiterated in closing argument:

> Walmart brought you a doctor . . . who was hired by Walmart in the past when a lady was shot at a Walmart, and he accused her of exaggerating her pain when he tried to grab her breast and she winced because he tried to grab her breast. Dr. Gwynn is accusing [Leverette] of the same thing, embellishing.

Again, Walmart did not object to this argument.

On appeal, Walmart does not assert that it is entitled to a new trial based on the admission of this evidence and/or improper argument by Leverette's counsel. Instead, Walmart contends, as it did below, that this line of questioning along with counsel's argument "insinuate[ed] that Dr. Gwynn had committed sexual impropriety in his examination of another patient in an unrelated case[, demonstrating] why the jury's exorbitant nominal damage award was the result of bias, prejudice, or mistake[.]"

> Our Supreme Court has explained that

> witnesses' compensation may be relevant and admissible to show bias under [OCGA §§ 24-4-401, 24-4-402, and 24-6-622], or for other permissible purposes, depending on the facts of the case. But . . . such evidence, like other evidence, may be excluded if its probative value is

substantially outweighed by the danger of unfair prejudice, under [OCGA § 24-4-403].

(Punctuation and emphasis omitted.) *Chrysler Group v. Walden*, 303 Ga. 358, 371 (II) (B) (812 SE2d 244) (2018). OCGA § 24-6-622[4]

> is a "holdover" from Georgia's old Evidence Code with no federal counterpart, [and thus we] look . . . to Georgia cases decided under the former version of that rule — OCGA § 24-9-68 — for guidance. In *Chrysler*, [our Supreme Court] looked to cases decided under former OCGA § 24-9-68 and determined that proper applications of this rule of evidence included the ability to question an opposing party's expert witness about how often he had been hired by the counsel in the case and how much he had been paid[.]

(Citation and punctuation omitted.) *Merritt v. State*, 311 Ga. 875, 880 (3) (a) (i) (860 SE2d 455) (2021). See *Whitner v. State*, 276 Ga. 742, 745 (4) (584 SE2d 247) (2003) ("cross-examination of [defense expert] concerning the number of times he has been hired by defense counsel and how much he was paid was appropriate to show that the objectivity of the witness may have been clouded"), disapproved on other grounds,

---

[4] This Code section provides: "The state of a witness's feelings towards the parties and the witness's relationship to the parties may always be proved for the consideration of the jury."

*Ledford v. State*, 289 Ga. 70 (709 SE2d 239) (2011). Finally, the "control of the nature and scope of cross-examination of a witness is a matter within the sound discretion of the trial court." (Citation and punctuation omitted.) *Hillman v. ALDI*, 349 Ga. App. 432, 440 (1) (825 SE2d 870) (2019).

In light of the admissibility of a witness' compensation and other like evidence,[5] we do not see this as "evidence of prejudice or bias . . . on the part of the jury" in its award of nominal damages. *Wright*, 262 Ga. App. at 663 (2). And, to the extent we can consider the unobjected-to argument by Leverette's counsel — an issue we do not today decide — we conclude that it does not rise to the level of showing that the jury's verdict, in light of the totality of the evidence presented at trial, was the product of bias, prejudice, or mistake.

*Judgment affirmed. Dillard, P. J., and Padgett, J., concur.*

---

[5] In this vein, the trial court charged the jury: "When a witness is being paid for reviewing and testifying concerning the evidence, you may consider the possibility of bias and should view with caution the testimony of such witness where court testimony is given with regularity and represents a significant portion of the witness's income."